AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**3/17/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY:      MMC      DEPUTY

# UNITED STATES DISTRICT COURT

for the
Central District of California

United States of America

**FILED**
CLERK, U.S. DISTRICT COURT

**3/17/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY:      ts      DEPUTY

v.

EUGENE HENLEY, JR.; SYLVESTER
ROBINSON; MARK MARTIN; TERMAINE
ASHLEY WILLIAMS; ARMANI AFLLEJE;
FREDRICK BLANTON, JR.; and TIFFANY
SHANRIKA HINES,

          Defendant(s)

Case No.    2:25-MJ-01494-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  In or around the years of 2010 through the present, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

|          *Code Section*          |          *Offense Description*          |
|----------------------------------|-----------------------------------------|
| 18 U.S.C. §§ 1962(d), 1951(a), 2421(a), 1344(1) | RICO Conspiracy; Interference with Commerce by Robbery; Transportation of an Individual in Interstate Commerce with Intent that the Individual Engage in Prostitution; Bank Fraud |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

  ☒ Continued on the attached sheet.

_____
*/s/ Andrew James Roosa*
*Complainant's signature*

_____
Andrew James Roosa, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    March 17, 2025

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin Butler at (x6495)

## Contents

I.     INTRODUCTION..........................................4

II.    PURPOSE OF AFFIDAVIT..................................5

III.   PERSONS, PROPERTY, AND PREMISES TO BE SEARCHED.......6

IV.    ITEMS TO BE SEIZED...................................7

V.     SUMMARY OF THE INVESTIGATION.........................9

VI.    SUMMARY OF PROBABLE CAUSE...........................12

VII.   STATEMENT OF PROBABLE CAUSE.........................19

       A.   The Big U Enterprise..........................20

       B.   The Check In..................................25

            1.   How the "Check In" Works................25

            2.   How HENLEY and the Big U Enterprise Respond
                 to Failures to Check In.................27

       C.   Supposedly Legitimate Businesses and Charities
            Used by the Big U Enterprise..................29

       D.   Racketeering Activity of Murdering R.W.........32

            1.   Summary.................................32

            2.   The Murder and Connection to the Big U
                 Enterprise..............................33

            3.   HENLEY's Cellphone Location Corroborates His
                 Involvement in R.W.'s Murder............35

            4.   Evidence from the Scene.................37

            5.   HENLEY Arranges for Recording Equipment from
                 the Studio to be Removed and Surveillance
                 Video to be Destroyed...................38

            6.   Interviews of Family, Witnesses, and Big U
                 Enterprise Associates...................39

            7.   Title III Interceptions.................44

       E.   Robbery in Violation of the Hobbs Act and as
            Racketeering Activity.........................48

            1.   HENLEY Directs a Robbery of and Conspires to
                 Rob, and ROBINSON and WILLIAMS Personally

Rob, a Marijuana Dispensary at Gunpoint....49

2.   WILLIAMS Continues to Commit and Discuss Robberies and Other Violent Acts..........51

3.   Further Evidence of the Big U Enterprise's Involvement in Robberies...................53

F.   Extortion in Violation of the Hobbs Act and as Racketeering Activity...........................55

G.   Transportation of Individuals in Interstate Commerce with Intent that the Individuals Engage in Prostitution in Violation of the Mann Act and as Racketeering Activity........................64

H.   Fraud in Violation of Federal Wire Fraud and Bank Fraud Statutes and as Racketeering Activity.....67

1.   Economic Injury Disaster Loan Program Fraud ..........................................67

2.   Wire Fraud Through Embezzlement of Charitable Donations.......................70

3.   Bank Fraud.................................76

I.   HENLEY's Tax Crimes.............................77

J.   Other Criminal Activity Showing How the Big U Enterprise Operates...........................79

1.   HENLEY Coerces a Witness to Recant Statements to Law Enforcement Implicating a Big U Enterprise Associate.................80

2.   HENLEY Makes Various Threats and Brags about Violence to Further the Big U Enterprise's Reputation for Fear and Violence, Solidifying Its Power to Extort Victims....81

3.   HENLEY and ROBINSON Describe Other Threats and Violent Acts of the Big U Enterprise...84

VIII.   Identification of the Property and Premises to Be Searched and Probable Cause That Evidence of the Various Subject Offenses Will Be Found in That Property and at Those Premises.....................85

IX.   SUMMARY OF PROBABLE CAUSE THAT DEVELOPING OPTIONS IS PERMEATED BY FRAUD AND THAT RELEVANT EVIDENCE WILL BE FOUND AT DEVELOPING OPTIONS' PREMISES................89

X.   TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES.....91

XI.   TRAINING AND EXPERIENCE ON ROBBERY AND EXTORTION
      OFFENSES.........................................93

XII.  TRAINING AND EXPERIENCE ON HOMICIDE OFFENSES.........95

XIII.     TRAINING AND EXPERIENCE ON HUMAN TRAFFICKING
      OFFENSES.........................................96

XIV.  TRAINING AND EXPERIENCE ON FINANCIAL CRIMES.........97

XV.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES..........99

XVI.  CONCLUSION......................................105

## AFFIDAVIT

I, Andrew James Roosa, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent (an "SA") with the Federal Bureau of Investigation (the "FBI") and have been so employed since September 2018.  I am currently assigned to a Criminal Enterprise Squad at the Orange County Resident Agency of the FBI, where I am tasked with investigating violent gangs and organized criminal enterprises.  From March 2019 through December 2024 when I joined the Orange County Resident Agency, I was assigned to the Los Angeles Field Office investigating violent gangs and organized criminal enterprises in conjunction with the Los Angeles Metropolitan Task Force on Violent Gangs (the "LAMTFVG"), a multi-agency federal, state, and local gang task force.  My experience as an SA with the FBI includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, working with informants, issuing subpoenas, analyzing pen register and trap and trace records, interviewing subjects and witnesses, consensually monitored meetings and telephone calls, analyzing financial records, and conducting court-authorized interception of wire communications. I have received training in the investigation of violations of federal law, including racketeering laws and federal drug conspiracy laws, and have personally participated in and assisted with several gang investigations involving racketeering and drug conspiracies.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.    This affidavit is made in support of a criminal complaint and arrest warrants for:

a.    EUGENE HENLEY, JR., also known as ("aka") "Big U," aka "Unc," aka "Draws," aka "Hannibal," aka "Hannibal Muhammad," aka "Anybody Killa," aka "Dave Austin" ("HENLEY"), SYLVESTER ROBINSON, aka "Vey" ("ROBINSON"), and MARK MARTIN, aka "Bear Claw" ("MARTIN"), for a violation of Title 18, United States Code, Section 1962(d) (Racketeer Influenced and Corrupt Organizations Conspiracy);

b.    TERMAINE ASHLEY WILLIAMS, aka "Luce Cannon" ("WILLIAMS"), for a violation of Title 18, United States Code, Section 1951(a) (Interference with Commerce by Robbery);

c.    ARMANI AFLLEJE, aka "Mani" ("AFLLEJE"), for a violation of Title 18, United States Code, Section 2421(a) (Transportation of an Individual in Interstate Commerce with Intent that the Individual Engage in Prostitution); and

d.    FREDRICK BLANTON, JR. ("BLANTON") and TIFFANY SHANRIKA HINES ("HINES") for a violation of Title 18, United States Code, Section 1344(1) (Bank Fraud).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts are approximate, and all dates and times are on or about those indicated.

### III. PERSONS, PROPERTY, AND PREMISES TO BE SEARCHED

4.    This affidavit is also made in support of warrants to search the following:

a.    The person of HENLEY, as described in Attachment A-1;

b.    A black 2021 Mercedes, registered to HENLEY and believed to be used by HENLEY, bearing California license plate 8UTW346 ("HENLEY'S MERCEDES"), as described in Attachment A-2;

c.    HENLEY's residence at 4159 West 62nd Street, Los Angeles, California 90043 ("HENLEY'S 62ND STREET PREMISES"), as described in Attachment A-3;

d.    HENLEY's residence at 5847 Arlington Avenue, Los Angeles, California 90043 ("HENLEY'S ARLINGTON PREMISES"), as described in Attachment A-4;

e.    The person of ROBINSON, as described in Attachment A-5;

f.    ROBINSON's residence at 17720 Superior Street, Unit 111, Northridge, California 91325 ("ROBINSON'S PREMISES"), as described in Attachment A-6;

g.    The person of MARTIN, as described in Attachment A-7;

h.   MARTIN's residence at 3061 S. Robertson Boulevard, Apartment 5, Los Angeles, California 90034 ("MARTIN'S PREMISES"), as described in Attachment A-8; and

i.   The business of Ex-Offender Fellowship Network, doing business as Developing Options and other names ("Developing Options"), located at 5444 Crenshaw Boulevard, Suites 202 and 203, Los Angeles, California 90034 ("DEVELOPING OPTIONS' PREMISES"), as described in Attachment A-9. Attachments A-1 through A-9 are incorporated herein by reference.

## IV. ITEMS TO BE SEIZED

5.   The items to be seized from HENLEY, HENLEY'S MERCEDES, HENLEY'S 62ND STREET PREMISES, and HENLEY'S ARLINGTON PREMISES are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organizations Conspiracy), 18 U.S.C. § 1962(c) (Unlawful Debt Collection), 18 U.S.C. § 1951(a) (Conspiracy to Interfere, Interference, and Attempted Interference with Commerce by Robbery and Extortion), 18 U.S.C. § 924(c) (Use of a Firearm in Furtherance of a Crime of Violence), 18 U.S.C. § 2421(a) (Transportation of an Individual in Interstate Commerce with Intent that the Individual Engage in Prostitution), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 666(a)(1)(A) (Embezzlement, Conversion, and Intentional Misapplication of Funds from Organization Receiving Federal Funds), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1014 (False Statement to a Financial Institution), 26 U.S.C. § 7201 (Attempt to Evade or Defeat Income Tax), 26 U.S.C. § 7203

(Willful Failure to File Tax Return), and 18 U.S.C. § 18 (Obstruction of Justice) ("HENLEY's Subject Offenses"), as described in Attachment B-1, which is incorporated herein by reference.

6.   The items to be seized from ROBINSON, ROBINSON'S PREMISES, MARTIN, and MARTIN'S PREMISES are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organizations Conspiracy), 18 U.S.C. § 1951(a) (Conspiracy to Interfere, Interference, and Attempted Interference with Commerce by Robbery and Extortion), 18 U.S.C. § 924(c) (Use of a Firearm in Furtherance of a Crime of Violence), and 18 U.S.C. § 18 (Obstruction of Justice) ("ROBINSON's and MARTIN's Subject Offenses"), as described in Attachment B-2, which is incorporated herein by reference.

7.   The items to be seized from DEVELOPING OPTIONS' PREMISES are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organizations Conspiracy), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C § 1951(a) (Conspiracy to Interfere, Interference, and Attempted Interference with Commerce by Extortion), 18 U.S.C. § 666(a)(1)(A) (Embezzlement, Conversion, and Intentional Misapplication of Funds from Organization Receiving Federal Funds), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1014 (False Statement to a Financial Institution), 26 U.S.C. § 7201 (Attempt to Evade or Defeat Income Tax), and 26 U.S.C. § 7203 (Willful Failure to File Tax Return) ("Developing

Options' Subject Offenses"), as described in Attachment B-3, which is incorporated herein by reference.

## V.  <u>SUMMARY OF THE INVESTIGATION</u>

8.   In February 2021, the FBI Los Angeles Metropolitan Task Force on Violent Gangs ("LAMTFVG") launched an investigation into HENLEY's criminal enterprise (the "Big U Enterprise") and its association with the Rollin' 60s Neighborhood Crips street gang (the "Rollin' 60s"), which the LAMTFVG began investigating in August 2020.  The Big U Enterprise is a mafia-like[1] organization that utilizes HENLEY's stature and long-standing association with the Rollin' 60s and other street gangs to intimidate businesses and individuals in Los Angeles.  The Big U Enterprise is led by HENLEY.  HENLEY is a self-admitted member and "original gangster" or "OG" of the Rollin' 60s, a violent criminal street gang with associated sets in several other states.  HENLEY is widely regarded as a leader within the Rollin' 60s.

9.   In the 1980s, HENLEY rose to a prominent position in the Los Angeles drug and Rollin' 60s hierarchies.  During this time, HENLEY also earned a reputation as an enforcer for the Rollin' 60s.  Some members of the Big U Enterprise are also members of the Rollin' 60s.  HENLEY is able to lead the Big U Enterprise because of his standing as the face of the Rollin' 60s for decades and his reputation for violence, including murder.  At times, the Big U Enterprise partners with members

---

[1] In interviews, HENLEY has stated that he believes "his story" is the modern-day mafia story.

and associates of the Rollin' 60s and other criminal elements for mutual benefit, but the Big U Enterprise is a distinct and independent criminal enterprise engaged in criminal activity. Members and associates of the Big U Enterprise are engaged in illegal activities, including extortion, robbery, murder, human trafficking, wire fraud, bank fraud, other financial crimes, obstruction of justice, illegal debt collection, illegal gambling, conspiracy to commit fraud via illegal gambling, and other offenses in furtherance of the Big U Enterprise and for the benefits of its members and associates.

10. As set forth in detail below, through the course of the investigation, agents gathered information from a variety of sources including: (1) confidential human sources; (2) surreptitious recordings, including Title III wiretaps; (3) search warrants for social media, iCloud, and Google accounts; (4) financial records from both individuals and companies or organizations; (5) toll records showing communications between conspirators, victims, and Big U Enterprise members and associates; (6) cell-site location information from numerous phones, including HENLEY's, ROBINSON's, and MARTIN's; (7) City of Los Angeles records, public filings, and other publicly available information; and (8) interviews of witnesses and victims. The investigation employed various additional investigative techniques, including surveillance, vehicle tracking, pole cameras, recording devices, interaction with confidential sources, and information gleaned through undercover purchases of firearms and narcotics.

11.   The United States District Court for the Central
District of California authorized multiple Title III wire and
electronic interception orders for telephones being used by
certain subjects of the investigation, including HENLEY,
ROBINSON, MARTIN, and Zihirr Mitchell, aka "Bricc Baby"
("Mitchell").[2]  The Court also authorized the interception of
audio and visual, non-verbal conduct via closed circuit
television ("CCTV"), through the installation of video and audio
bugs in a location.[3]

12.   Since the inception of this investigation, the FBI,
Internal Revenue Service (the "IRS") Criminal Investigation
("IRS-CI"), United States Attorney's Office for the Central
District of California, North Las Vegas Police Department
("NLVPD"), Los Angeles Police Department ("LAPD"), and other
local agencies have interviewed more than 50 individuals,
including subjects of the investigation who agreed to
voluntarily provide information, as discussed further below.
Based on information learned from these individuals and other
sources, FBI SAs, IRS-CI SAs, NLVPD detectives, and LAPD
detectives requested and obtained additional search warrants and
subpoenas.  Below, I summarize the information and evidence
obtained thus far from these various investigative tools where

---

[2] Mitchell is the subject of a separate, sealed indictment,
pending in Case No. 2:25-CR-00132.

[3] In certain points below, I summarize wire and electronic
communications that investigators intercepted pursuant to court
orders.  In other points, I quote from or paraphrase agents'
understanding of those interceptions.

relevant to the requested complaint and warrants.  The
investigation remains ongoing.

## VI. SUMMARY OF PROBABLE CAUSE

13.  HENLEY, ROBINSON, and MARTIN, and others known and
unknown, are members of the Big U Enterprise, a criminal
organization whose members and associates engage in, among other
things, murder, kidnapping, robbery, extortion, interstate
transportation for the purposes of prostitution, bank fraud,
wire fraud, embezzlement, and obstruction of justice.  The Big U
Enterprise operates within the Central District of California
and elsewhere.

14.  The Big U Enterprise, including its leaders, members,
and associates, constituted an "enterprise," as defined by Title
18, United States Code, Section 1961(4), that is, a group of
individuals associated in fact that engaged in, and the
activities of which affected, interstate and foreign commerce.
The Big U Enterprise constituted an ongoing organization whose
members and associates functioned as a continuing unit for a
common purpose of achieving the purposes of the Big U
Enterprise.

15.  The purposes of the Big U Enterprise include, but are
not limited to, the following:

a.  Enriching Big U Enterprise members and associates
by using the power and status of the Big U Enterprise and HENLEY
as an "original gangster" of the Rollin' 60s to commit
extortion, robbery, fraud, and other crimes;

b.    Promoting, protecting, and expanding the power, reputation, and profits of the Big U Enterprise and its members and associates through the use of intimidation, fear, violence, threats of violence, assaults, extortion, and murder;

c.    Using social media platforms, documentaries, podcasts, interviews, and HENLEY's reputation and status to create fame for, and stoke fear of, the Big U Enterprise, its members, and its associates;

d.    Financially enriching Big U Enterprise members and associates by defrauding donors to nonprofit entities under the control of the Big U Enterprise and its members and associates, including Developing Options;

e.    Financially enriching Big U Enterprise members and associates by defrauding federal, state, and local agencies that awarded grants and other financial support to nonprofit entities under the control of the Big U Enterprise and its members and associates, including Developing Options;

f.    Financially enriching Big U Enterprise members and associates by defrauding mortgage lending businesses to make loans to employees of entities under the control of the Big U Enterprise and its members and associates, including Uneek Music Entertainment, Inc. ("Uneek Music") and Developing Options;

g.    Gratifying Big U Enterprise members and associates by trafficking and exploiting sex workers; and

h.    Concealing and protecting the illegal activities of the Big U Enterprise and its members and associates from

detection by law enforcement through means that included, among other things, witness tampering and obstruction of justice.

16.  Beginning no later than 2010, and continuing to the present, in Los Angeles County, within the Central District of California and elsewhere, HENLEY, ROBINSON, and MARTIN, each being a person employed by and associated with the Big U Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Big U Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), which pattern of racketeering consisted of:

      a.  Multiple acts involving:

        i.  murder, chargeable under Nevada Revised Statutes, Sections 200.010, 200.030, 193.330, 193.153, 195.020, 199.480, and 199.490;

        ii.  kidnapping, chargeable under Nevada Revised Statutes, Sections 200.310, 193.330, 193.153, 195.020, 199.480, and 199.490;

        iii. robbery, chargeable under California Penal Code, Sections 211, 212, 212.5, 213, 21a, 31, 182, and 664;

        iv.  extortion, chargeable under California Penal Code, Sections 518, 519, 524, 21a, 31, 182, and 664; and

      b.  multiple acts indictable under:

                    i.    Title 18, United States Code, Section 1343
(relating to wire fraud);

                    ii.   Title 18, United States Code, Section 1344
(relating to financial institution fraud); and

                    iii.  Title 18, United States Code, Section 1951
(relating to interference with commerce, robbery or extortion);
and

                    iv.   Title 18, United States Code, Section 2421
(relating to interstate transportation for the purposes of
prostitution).

    17.  It was further part of the conspiracy that HENLEY,
ROBINSON, and MARTIN agreed that a conspirator would commit at
least two acts of racketeering activity in the conduct of the
affairs of the Big U Enterprise.

    18.  HENLEY, ROBINSON, MARTIN, and other members and
associates of the Big U Enterprise conducted, and participated
in the conduct of, the affairs of the Big U Enterprise through
the following means and methods, among others:

        a.    Members and associates of the Big U Enterprise
committed, and conspired, attempted, and threatened to commit,
acts of violence, including murder, armed assaults, robberies,
extortions, acts of intimidation, and threats of violence to
generate income, create an atmosphere of fear, protect and
expand the Big U Enterprise's reputation for violence, and
expand the Big U Enterprise's criminal operations.

        b.    Members and associates of the Big U Enterprise
used HENLEY's history and reputation, including his connections

to the violent Rollin' 60s street gang, to tout the Big U
Enterprise's reputation for violence and that the Big U
Enterprise "controlled" Los Angeles.

      c.   As part of the Big U Enterprise's purported
"control" of Los Angeles, individuals, including professional
athletes, musicians, and others, intending to conduct certain
types of business in Los Angeles, including both legitimate
business and illicit criminal conduct, were required to "check
in" with HENLEY prior to traveling to Los Angeles or engaging in
certain activities to obtain "protection" from the Big U
Enterprise while in Los Angeles.  HENLEY hosted a podcast titled
"Checc'n In,"[4] the opening theme song of which explained, "When
you hop off the plane, check in.  Penthouse suite, check in.
When your feet hit the street, check in.  'Cause if not, shit
get hot.  You better check in."  The "check in" included both a
payment to the Big U Enterprise as well as requesting permission
from HENLEY to conduct certain activities, including acts of
violence, that were sanctioned by the Big U Enterprise.  As
HENLEY described in a documentary film that he produced about
his life titled "Hip Hop Uncovered," "If I don't pick up the
phone, that can mean death for somebody."  As HENLEY stated in
the "Nothing 2 Somethin" podcast, "You gonna check in . . . .
You could choose not to, and it's gonna be a problem . . . .  **If
you choose not to check in, you suffer the consequences**; you

---

[4] Based on my training and experience, I know that members
of Crip-affiliated gangs do not use the letters "ck" together,
because members of their rival Blood-affiliated gangs use "ck"
to refer to "Crip killer."  Therefore, Crip gang members often
replace "ck" with "cc."

feel like you got something bigger than what's there" and that
not checking in is basically "an act of war . . . .  It ain't
not one human being who not gonna check in."

        d.    While members and associates of the Big U
Enterprise used HENLEY's and the Big U Enterprise's history and
reputation to "control" Los Angeles through violence, fear, and
intimidation, HENLEY simultaneously attempted to create an air
of legitimacy for the Big U Enterprise by promoting himself as a
reformed gang member focused on bettering his community through
purported nonprofit organizations he founded, such as Developing
Options, and by soliciting donations from celebrities and grants
from governments and foundations to these charitable
organizations.  In actuality, HENLEY and other members and
associates of the Big U Enterprise used these purported
nonprofit entities to enrich and further the objectives of the
Big U Enterprise, including by:

        i.    Embezzling funds meant as charitable
donations to the nonprofit entities;

        ii.    Using the nonprofit entities to fraudulently
apply for government assistance and loans; and

        iii. Using the nonprofit entities to falsify
employment and financial records to personally benefit members
and associates of the Big U Enterprise.

        e.    Members and associates of the Big U Enterprise
would "discipline" other members and associates who acted in
ways seen as detrimental to the Big U Enterprise, or other
individuals who were seen as disrespecting the Big U Enterprise

or its members, including through threats and acts of violence such as assault, kidnapping, and murder.

   f. Members and associates of the Big U Enterprise would avoid detection by law enforcement by, among other activities:

    i. Attempting to thwart and evade law enforcement surveillance;

    ii. Destroying video surveillance or other evidence; and

    iii. Threatening or otherwise pressuring victims or witnesses of crimes committed by members or associates of the Big U Enterprise to avoid interaction with, or to provide untruthful statements or testimony to, law enforcement officers.

  19. In sum, there is probable cause to believe that, in furtherance of the Big U Enterprise:

   a. HENLEY kidnapped and murdered victim R.W. in Las Vegas in retaliation for perceived disrespect to the Big U Enterprise, and endeavored to conceal that murder with other Big U Enterprise members and associates;

   b. HENLEY, ROBINSON, MARTIN, and WILLIAMS committed and arranged robberies to enrich the Big U Enterprise, further the extortions committed by the Big U Enterprise, and to create the impression that the Big U Enterprise controlled Los Angeles;

   c. HENLEY, ROBINSON, and MARTIN extorted individuals in Los Angeles for purported protection, when such protection was actually from violence committed by the Big U Enterprise itself;

d.    HENLEY and AFLLEJE arranged for the interstate transportation of individuals to engage in prostitution for HENLEY and Big U Enterprise members;

e.    HENLEY defrauded various companies, donors, athletes, and celebrities into providing donations to the Big U Enterprise's charities, only to transfer those donations to his own personal bank accounts for personal use;

f.    HENLEY fraudulently obtained funding from the City of Los Angeles's Mayor's Office through the Gang Reduction Youth Development ("GRYD") Foundation, portions of which received federal funding;

g.    HENLEY defrauded and attempted to defraud the Small Business Administration (the "SBA") for loans that benefited the Big U Enterprise;

h.    To enrich BLANTON, a Big U Enterprise associate who purported to work for the Big U Enterprise's charitable organization, HENLEY, MARTIN, BLANTON, and HINES committed bank fraud by submitting a fraudulent mortgage application; and

i.    HENLEY, ROBINSON, and MARTIN, and other members and associates of the Big U Enterprise, attempted to obstruct investigations into and conceal the above-referenced crimes committed on behalf of the Big U Enterprise.

## VII. **STATEMENT OF PROBABLE CAUSE**

20.  Unless otherwise noted below, my knowledge of the facts summarized herein is based on my training and experience, my discussion with other investigators, and my review of law enforcement reports, search warrant and subpoena returns, Title

III wiretap interceptions, public domain interviews (to include
YouTube and podcast interviews and docuseries), electronic and
other written communications, interviews of certain individuals,
and City of Los Angeles records and other publicly available
documents.

**A.    The Big U Enterprise**

21.    As discussed herein, I believe that HENLEY led the Big
U Enterprise; ROBINSON was a years-long associate and confidant
of HENLEY and served as his righthand man, underboss, and
enforcer in the Big U Enterprise; and MARTIN was also a close
confidant and trusted lieutenant of HENLEY in the Big U
Enterprise.

22.    Much of the Big U Enterprise's structure and
affiliation with the Rollin' 60s is in the public domain.  In
the television series Hip Hop Uncovered (the "docuseries"),
which HENLEY executive produced, HENLEY detailed the history of
the Rollin' 60s and his involvement with that gang.  HENLEY
admitted he was a Rollin' 60s member from the first generation.
HENLEY advised that the Rollin' 60s was a large Crip gang known
to instill fear in the community.[5]  HENLEY claimed that he did
not have gang-related tattoos because people already knew where
he was from, and it was "never a question."  A similar quote
that HENLEY often repeated when asked why he has no gang tattoos

---

[5] Based on my training, experience, and participation in
this investigation, this statement corroborates precisely how
the Big U Enterprise works to this day: HENLEY uses the fear
instilled by the Rollin' 60s in the community -- and his
prominent association with that gang -- to further the Big U
Enterprise's racketeering activity and profit from the same.

is that "it isn't on you; it's in you."  After encountering legal trouble as a juvenile, HENLEY moved from California to Chicago.  HENLEY admitted elsewhere to being "on the run" and conducting illegal drug activities in Chicago.  While HENLEY was living in Chicago, HENLEY decided to move back to Los Angeles to participate in the gang war after an associate's murder.  At that time, HENLEY noted his mentality was that "we [were] hunting.  To us, it wasn't about fighting; it was about guns now . . . .  My philosophy was: the gun can get you any and everywhere you need to be."

23.  After HENLEY returned to Los Angeles in the 1980s, he became known as a fighter for the Rollin' 60s by fighting other gang members.  As HENLEY recalled, those fights were about dominating the Rollin' 60s competition.  HENLEY remembered he and approximately 200 other Rollin' 60s gang members went to a Run-D.M.C. concert at the Long Beach Convention Center to establish and maintain their dominance within the Los Angeles-based street gang scene.  HENLEY characterized his and the Rollin' 60s' moral code at that time as "get 'em before they get you."

24.  Throughout the 1980s, HENLEY fostered a fierce and earned reputation for violence, which included multiple charges for first degree murder, as well as a charge for attempted murder of a peace officer.

25.  According to these statements, HENLEY believed that by 1987, he had cemented his reputation as a tough person who should not be crossed.  HENLEY recounted serving time in county

jail, where he beat up other inmates for the purposes of establishing a pecking order.  HENLEY was also earning money through the drug trade in other cities, such as Minneapolis, where he realized he had influence over other Rollin' 60s gang members.

26.  When HENLEY was 22 years old, he claimed to stop selling drugs and transitioned to a different racket.  He believed his moniker "Big U" was "so big and ominous.  Every time I go through a door, I really was a beast.  That was the mentality."  Despite having such power within the Rollin' 60s, HENLEY did not have a reliable source of income outside of the drug trade.

27.  HENLEY subsequently connected with the hip hop artist Kenneth Green, aka "Poppa LQ," and became his manager.  In the docuseries, Poppa LQ recounted that HENLEY was in tune with both the community and gang culture.  HENLEY also became the manager of hip hop artist Ricardo Emmanuel Brown, aka "Kurupt," a self-admitted Rollin' 60s gang member.

28.  In 1991, HENLEY was found guilty and sentenced to 23 years in state prison for robbery, and as he admitted, he was also charged with kidnapping.  While HENLEY was incarcerated, HENLEY stated that Kurupt maintained contact with HENLEY and ensured he was kept abreast of developments in the music industry.  In 2022, on the podcast "Dub C and C Mac Show," HENLEY described himself as an enforcer in prison and recounted knocking somebody's eyeball out of their socket as well as committing stabbings.

29.  In 2004, HENLEY was released from prison.  In the docuseries, hip hop artist Calvin Broadus, Jr., aka "Snoop Dogg," characterized HENLEY as "institutionalized.  You say the wrong thing, you get fucked up.  He was short-tempered and serious about the shit he was on.  Something about him I liked 'cause I felt like he was a leader."  HENLEY claimed that he was focused on healing his community when he returned home from prison.  According to HENLEY, his primary objective was to effect change and lift his community to a better place, instead of destroying it.

a.  HENLEY's own words, though, show the falsity of his claimed reformation.  For example, On December 31, 2022, on an intercepted call, HENLEY explained his motivation for committing murders on behalf of the Big U Enterprise, stating: "What you guys see on the Internet, y'all keep hearing other people who don't have nothing to talk about but sell.  Let me explain something to you.  If I would've had a problem with any man, color, creed, king, or kind, the issue would've been resolved, and he wouldn't be here, or I wouldn't be here.  It ain't no kid nothin'. **And it damn near nobody who been in this muthafucka longer than me, can stand against me, and me be who I am.  If I had a problem with any man, and this wouldn't be so funny to me.  I'm still who they say I am."**

b.  Similarly, on April 23, 2023, on an intercepted call, HENLEY discussed gang politics with a co-conspirator and stated, **"I'm retired, nigga?  Activist?  I'll pull up on your block right now, nigga, and show up and show out, nigga.  That's**

**what happened to the last niggas that thought I was retired."**

30.  According to the docuseries, as HENLEY transitioned to life in Los Angeles following incarceration, he returned to the hip hop industry.  Kurupt connected HENLEY with Suge Knight, the former Chief Executive Officer ("CEO") of Death Row Records. HENLEY recounted that Suge Knight assisted him financially when he was released from prison.  HENLEY referred to himself as the "Blue[6] Suge Knight,"[7] as HENLEY, as of 2004, was widely regarded as a leader of the Rollin' 60s.  Because of this reputation, HENLEY was well positioned to ultimately form and lead the Big U Enterprise.

31.  In approximately 2008, HENLEY formed a relationship with the hip hop artist Airmiess Joseph Asghedom, aka "Nipsey Hussle."  After several years, HENLEY temporarily left the industry after he had a falling out with Nipsey Hussle related to equipment at HENLEY's shop.  HENLEY recounted in the docuseries that Nipsey Hussle made a "diss" song about HENLEY but that HENLEY is "a scrapper, not a rapper."  HENLEY stated

---

[6] Based on my training and experience, I know that "blue" refers to the color associated with Crip gangs in Los Angeles, rather than the Blood gangs that Suge Knight associated with.

[7] Based on my investigation, I believe that this provides background and corroborates the Big U Enterprise's structure. Suge Knight openly hired members of the Mob Piru Bloods to work for Death Row Records -- just as HENLEY hires Rollin' 60s to work for his purported charities and companies.  Just as HENLEY operates on fear and threats, Suge Knight's criminal history is replete with criminal threats of violence and death.  Suge Knight is currently incarcerated for purposefully driving his car over two men, killing one.  In a recent interview, HENLEY stated that "outside of Suge Knight," HENLEY is the only person who has done more for the community and that HENLEY has bailed out Suge Knight and paid for his lawyer.

that even after they settled their differences, he picked up Nipsey Hussle one morning so that Nipsey Hussle could get "disciplined" for the diss song;[8] however, Nipsey Hussle's brother intervened and told HENLEY that Nipsey Hussle was not going anywhere.  LAPD reports documented that violence erupted, and when LAPD officers arrived on the scene, a firearm was present and discharged.  In 2019, Nipsey Hussle was murdered by a member of the Rollin' 60s.

   **B.    The Check In**

   32.   HENLEY and the Big U Enterprise are widely known for requiring a "check in" for out-of-town entertainers or gang members in Los Angeles.  As HENLEY described in the docuseries, "If I don't answer the phone, it can be death for someone else. Everywhere, there's someone like me, and you can't put a monetary value on his touch in hip hop."  After more than three decades as a Rollin' 60s member and several years managing famous hip hop artists, HENLEY was widely regarded as an "original gangster" or "OG."  In the docuseries, record producer Andre Young, aka "Dr. Dre," explained that it is very helpful to have an OG who can "clear the streets."  Within this operating environment, HENLEY instituted the concept of the "check in" when hip hop artists and other celebrities visit Los Angeles.

   1.   How the "Check In" Works

   33.   The "check in" is a term used when someone travels outside of their home city to another city.  During that travel,

---

   [8] As detailed below, I believe this illustrates how HENLEY and the Big U Enterprise respond to perceived slights or disrespect, through threats and physical violence.

the individual must "check in," or meet, with the local street representative of said city to pay a "tax" or "fee" for permission both to move about freely and to have an event or conduct business in that other city without the risk of harassment or danger from criminal elements. While HENLEY and other supporters attempt to persuade the public that the "check in" provides safety and security for those who do so, as set forth herein, HENLEY and the Big U Enterprise also manufacture the very danger they purport to protect against.

34. According to HENLEY's statements in the docuseries, as corroborated by our investigation, some visiting hip hop artists and other individuals pay HENLEY a fee to "check in" if they are not from Los Angeles. In the docuseries, James Antney, aka "Bimmy," and Steve Lobel, the CEO of A-2-Z Entertainment, stressed that it is important to know the right people, such as HENLEY, when visiting places like Los Angeles. However, as podcaster Livingston Allen, aka "DJ Akademiks," explained in the docuseries, the "check in" is analogous to a commission for the gang or neighborhood where an OG is from. Christian Anthony Mathis, aka "Trick Trick," explained in the docuseries that he enforces the "check in" in Detroit, Michigan. Trick Trick added, "Come without permission; I don't wanna hear shit you gotta say . . . . I created these laws, so I enforce them. All we coming for is our portion." Trick Trick further explained that he instituted a "No Fly Zone" in Detroit, in which artists could not perform in the city unless Trick Trick was paid. Without paying a commission to an OG's organization, such as the

Big U Enterprise, visitors to Los Angeles are at risk of violence. HENLEY has also provided examples of individuals who do not check in with him "until it's too late," such as the rap artist Tyquian Terrel Bowman, aka "Quando Rondo," whom HENLEY discussed in another interview and who was later targeted in a murder-for-hire plot where his associate was killed.

35.  When defending this practice in interviews, HENLEY has stated that it is no different than when a Learjet flies over United States airspace: they want to know who you are. HENLEY said his practice is no different, which I believe indicates that he purports to own and control Los Angeles through the Big U Enterprise.

       2.  How HENLEY and the Big U Enterprise Respond to
           Failures to Check In

36.  In 2022, the FBI interviewed a Cooperating Witness ("CW-1"),[9] who told the FBI about one of these "check in" incidents. CW-1 said that he knew HENLEY, who was a Rollin' 60s member. CW-1 also said HENLEY led a "money making gang" that was distinct from the Rollin' 60s, referring to the Big U Enterprise. According to CW-1, rap artists, athletes, and other individuals needed to pay HENLEY a fee when they visited Los

---

[9] CW-1 has a criminal history that includes convictions for possession for sales of narcotics in 2003 and 2009, in violation of California Health and Safety Code Sections 11350(a) and 11351.5, respectively, as well as shooting into an inhabited dwelling in 2003, in violation of California Penal Code Section 246. CW-1 received cooperation credit from the Central District of California at sentencing in a prior drug conspiracy case, alleging a violation of Title 21, United States Code, Section 846. However, former President Biden commuted CW-1's sentence for that offense.

Angeles.  CW-1 believed the fees that HENLEY collected were extortion payments.

37.  CW-1 then recounted that a large buy-in dice game occurred in Los Angeles in June 2019.  The game involved the professional boxer A.B., A.B.'s associates, and several prominent NBA players.  According to CW-1, A.B. and his associates fixed the game and cheated the NBA players out of millions of dollars using "teased" dice.

38.  Following that game, HENLEY directed a group of Big U Enterprise associates to "rough up" A.B., who did not "check in" with HENLEY, and to get the money back from him on behalf of the cheated NBA players.  Multiple members of the Rollin' 60s ultimately arrived, and HENLEY used them to press A.B.  CW-1 said that HENLEY was involved with the incident because HENLEY was involved in and/or would approve of any dice games or similar events, such as parties, involving large sums of money and prominent NBA players and celebrities in Los Angeles.[10] Multiple persons involved in the incident who have since been interviewed, including former NBA players, confirmed that HENLEY was paid $100,000 for negotiating this "debt."  However, each was later approached by associates of A.B. and told they still owed the money.

39.  CW-1 was aware of other instances where NBA players or other celebrities would need to work with and get approval in advance from HENLEY to ensure their safety at events in Los

---

[10] I am aware through interviews with NBA players that HENLEY was then paid a commission by some of the NBA players in order to threaten A.B. and negotiate the debt down or away.

Angeles such as parties, gambling games, or advertising shoots. CW-1 said that these celebrities would have to seek and/or pay HENLEY for protection and approval or face retaliation from the Big U Enterprise.

40. At the outset of the investigation, Victim-1[11] was identified as an extortion victim. Victim-1 is described further below. From April 14, 2022, until April 15, 2022, Victim-1 conducted a consensually monitored meeting with HENLEY and other unidentified individuals. During the meeting, HENLEY told Victim-1 and others that he "got into it" with A.B. after A.B. cheated a current NBA All-Star out of $1.5 million and a former NBA All-Star out of $5 million. HENLEY also said that he charged the players $100,000 so that he could get their money back from A.B. A confidential informant involved with the cheating scheme corroborated this information and that A.B. was confronted for failing to "check in" with HENLEY regarding the game.

### C. Supposedly Legitimate Businesses and Charities Used by the Big U Enterprise

41. HENLEY and MARTIN formed the independent record label Uneek Music in 1996. In 2004, HENLEY formed Developing Options, for which HENLEY is CEO and MARTIN is Chief Financial Officer

---

[11] Victim-1 has a criminal history that includes arrests for narcotics conspiracy and distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively, for which he is pending sentencing, robbery, in violation of California Penal Code Section 211, as well as a felony conviction for human trafficking of a minor under the age of 18, in violation of California Penal Code Section 236.1(c). Victim-1 will likely receive cooperation credit based on this case in his unrelated pending drug case from the United States Attorney's Office in the Southern District of Ohio.

("CFO").  Developing Options does business as many other entities, including the Crenshaw Rams youth football team, which is designed to give underprivileged children a safe outlet in sports with a chance to build skills for the future, including athletic scholarships.  According to its website, Developing Options uses advocacy, education, resources, training and development, and sports to achieve its objectives.  In the docuseries, HENLEY indicated that Developing Options was a platform he used to help individuals get to college instead of going to jail.  Many other publicly available recordings online show HENLEY describing the structure of Developing Options, how it is funded, and what it claims to do for the community.

42.  Since approximately 2015, Developing Options has been the recipient of an annual $550,000 as part of the GRYD program overseen by the City of Los Angeles.[12]  From July 1, 2018, to June 30, 2023, Developing Options was allotted $2,352,000 from the City of Los Angeles.  From that, HENLEY has drawn hundreds of thousands of dollars, purportedly in salary.

43.  The GRYD program has an extensive mandatory handbook that is appended to each contract and that Developing Options (like every other GRYD contractor) must comply with.  The detailed and extensive handbook has many requirements that include extensive criminal background checks, compliance, training, and approval of employees, attendance at meetings,

---

[12] GRYD also receives federal grants and funding; for example, from October 1, 2019, to September 30, 2022, GRYD received $371,590 from Project Safe Neighborhood, a federal Department of Justice program.

logging activity, and liaising with local law enforcement, among other requirements. Based on my review of documents in the course of this investigation, Developing Options appears to have failed to comply with some -- or potentially all -- of those requirements.[13]

44. HENLEY further solicits donations to Developing Options from celebrities, companies, foundations, and other entities, which the victim donors believe will further a charitable purpose but often instead are embezzled into HENLEY's personal bank account. As discussed in further detail below, HENLEY, ROBINSON, and MARTIN, and other Big U Enterprise co-conspirators, utilize Developing Options as a platform to conduct both violent crimes and financial crimes under the guise of gang intervention work.

45. HENLEY also fraudulently applied for federal pandemic-relief loans for his entities, including Developing Options, Uneek Music, and other businesses. The loans and/or advances he successfully obtained are discussed further below. Similarly, HENLEY and MARTIN helped one of their employees at Developing Options (i.e., BLANTON) fraudulently apply for a mortgage by manipulating his income records. The Big U Enterprise is committed to financially enriching its members and associates by stealing or cheating its victims out of money or property.

---

[13] For example, when subpoenaed for such information, Developing Options provided no documents certifying or signifying compliance with the GRYD handbook or any of its contractual obligations.

### D.   Racketeering Activity of Murdering R.W.

1.   <u>Summary</u>

46.   As set forth below, there is probable cause to believe that HENLEY murdered victim R.W. on January 25, 2021, and dragged his body into the desert in North Las Vegas.  On that morning, NLVPD detectives discovered the body of R.W. lying in the desert near the Apex Landfill.  R.W. had been shot multiple times and his body had been dragged and left in a ditch not far from Interstate 15.  Hours before his homicide, R.W. was at the studio of Witness-2 with HENLEY.  NLVPD investigation revealed that R.W. was one of HENLEY's recording artists and was at the studio as a guest of HENLEY, recording for Uneek Music, the independent record label that HENLEY and MARTIN co-founded.

47.   According to a studio witness, Witness-1,[14] who was employed as security for the recording studio, HENLEY was one of the last people seen with R.W. prior to R.W.'s homicide. Witness-1 also stated that ROBINSON drove HENLEY to Las Vegas from Los Angeles in a dark grey Lexus and that Witness-1, in his security capacity, encountered HENLEY and ROBINSON when they arrived at the studio and had words with them because he did not know who they were.  Witness-1's statements to NLVPD at the outset of the murder investigation have been corroborated by other witnesses and cellphone location data, among other evidence.  Further investigation revealed motive, opportunity,

---

[14] While Witness-1 has no criminal convictions, he has misappropriated money from his employers and has a civil money judgment entered against him that he paid back.

obstruction, inculpatory statements, and more from HENLEY and other members and associates of the Big U Enterprise.

      2.   The Murder and Connection to the Big U Enterprise

48. On January 20, 2021 (i.e., five days before the murder and three days before HENLEY and ROBINSON drove from Los Angeles to Las Vegas), R.W. recorded a "diss" (short for "disrespect") song that NLVPD later obtained. In it, R.W. rapped about the person who had the money, that R.W. would be "shot in the face for thinkin' shit funny," and referenced a .38 revolver with "no trace."

49. Based on my knowledge of this investigation and conversations with others, I believe that, in this "diss" song, R.W. was "dissing" HENLEY, referring to HENLEY as the "bro that makes some money" and that R.W. may get "shot in the face" for thinking his lackadaisical use of the studio -- and general representation by Uneek Music -- is "funny." R.W. was shot days later, in the face, apparently with a revolver (like a .38) that left no shell casings. It is unknown whether HENLEY heard these lyrics prior to the murder.

50. The effectiveness of the Big U Enterprise is premised on HENLEY's stature as the "most feared man in Los Angeles." As such, ensuring that no one disrespects HENLEY -- and that any such perceived disrespect is met with reprehensible violence -- is a core tenet of the Big U Enterprise, and even more so when that disrespect is displayed publicly, like in front of extortion victims. As HENLEY himself stated on an intercepted call in 2023, **"Can't no nigga beef with me, nigga. Cause if he**

do, I'ma kill him.  **Period.  I.  Am.  Going.  To.  Murder.
Him.**"  As ROBINSON explained in a surreptitious recording, "When
[HENLEY] got out, he said, 'I'm the toughest nigga, and here's
my body of work to prove it.  And you know . . . I'm the only
nigga still killin' niggas today.  You niggas retired.  I
didn't.'  They understand that."

51.  Because the Big U Enterprise's existence relies and
thrives on fear of violence, perception is paramount.  As
Witness-2 explained, HENLEY, through the Big U Enterprise's
entity Uneek Music, was using Witness-2's expensive, valuable
studio to record the Big U Enterprise's artist (R.W.) for free,
based on the fear and power dynamic imposed over Witness-2 by
the Big U Enterprise for years.  And, by taking a lackadaisical
approach to the studio time the Big U Enterprise had secured for
free, R.W. was wasting that time.  I believe that R.W. wasting
the time, thereby disparaging HENLEY's name and the Big U
Enterprise's reputation, and potentially flouting that
disrespect with the lyrics of the "diss" song, led to a dispute
between HENLEY and R.W.  The dispute was so serious that HENLEY
and ROBINSON drove from Los Angeles to Las Vegas to confront
R.W., and that dispute then turned deadly.

52.  Throughout our investigation, no investigator, family
member, witness, or any third party has ever identified any
individuals that would have motive or opportunity to murder
R.W., except HENLEY.  As discussed herein, HENLEY's motive for
murdering R.W. was in the interest of the Big U Enterprise.

3.   HENLEY's Cellphone Location Corroborates His
     Involvement in R.W.'s Murder

53.   I have reviewed cellphone location information
obtained via search warrants (by NLVPD) for two phones
associated with HENLEY for the time before, during, and after
the murder.  According to Witness-1, Witness-2, and one of
R.W.'s friends who was visiting him in Las Vegas the day he was
murdered, as well as an analysis of HENLEY's phones, HENLEY and
ROBINSON arrived in Las Vegas on January 23, 2021.

54.   The night before the murder, HENLEY's phone location
data and witnesses showed that he arrived at an Airbnb on
Roundrock Drive in Las Vegas, Nevada -- the Airbnb R.W. was
staying in prior to the homicide (the "Airbnb") -- in the middle
of the night.  HENLEY, through Uneek Music, was paying for the
Airbnb.  Surveillance footage from in front of the Airbnb showed
a dark grey or silver sedan arriving at the Airbnb and leaving
shortly after.  The surveillance video also showed HENLEY at the
Airbnb.

55.   On January 24, 2021, the night of the murder, at
approximately 7:04 p.m., HENLEY arrived at the studio.
According to witnesses, at approximately 8 p.m. or 9 p.m., R.W.
arrived at the studio and recorded a song from approximately 11
p.m. until midnight.  On January 25, 2021, at approximately
12:37 a.m., HENLEY left the studio, and the dark grey Lexus in
which he and ROBINSON had driven to the studio, was no longer at
the studio.  At approximately 12:58 a.m., HENLEY's phones

stopped reporting location data of any kind, with the last data recorded within the vicinity of the studio.[15]

56.  At approximately 1:13 a.m., surveillance footage at the Airbnb again revealed a dark grey or silver sedan arriving to the Airbnb.  R.W. exited the passenger side of the vehicle and entered the Airbnb.  A few minutes later, at approximately 1:20 a.m., R.W. exited the Airbnb with a suitcase, put the suitcase in the trunk, and got in the dark grey or silver sedan, which departed.  The Airbnb, though, was rented for another day, and R.W. was not set to leave until a flight scheduled the following day.  Both of HENLEY's phones did not begin reporting location data again until approximately 2:15 a.m.

57.  Based on investigator test drives and research, the drive from the studio to the Airbnb would take roughly 17 minutes.  After HENLEY's phones stopped reporting location data when they left the vicinity of the studio, the dark sedan arrived with R.W. at the Airbnb 15 minutes later (which is consistent with traffic patterns after midnight).  The drive from the Airbnb to the location where R.W.'s body was found and then to the location where HENLEY's phones began reporting again would take roughly 42 minutes.  The time from when R.W. left the Airbnb to when HENLEY's phones began reporting again is 48 minutes -- approximate time for the drive, murder, and moving of the body (particularly in the middle of the night without traffic).

---

[15] In a 2021 "Drink Champs" interview, HENLEY discussed the difficulty of getting away with crimes in the modern age because "the phone" and its location "tells all."

58.  One of HENLEY's phones then made a call to ROBINSON, who Witness-1 reported was still at the studio, which is corroborated by ROBINSON's phone location data.  According to Witness-1, ROBINSON asked Witness-1 if he had seen HENLEY, which Witness-1 found odd since ROBINSON was HENLEY's driver and bodyguard.  At approximately 2:30 a.m. or 3 a.m., HENLEY returned to the studio alone in the dark grey Lexus and spoke with Witness-1, who reported that HENLEY appeared to be drenched in either sweat or water.  HENLEY told Witness-1 that he was coming back from the gym.

59.  R.W.'s body was found hours later, at approximately 9 a.m.  One of the NLVPD detectives investigating the murder believed R.W. died at that location near the side of the road on I-15 after he observed the roadway contained a distinct patch of blood, which trailed down the hill from the roadway into the desert along with the drag marks.  HENLEY's phone location data shows that he departed Las Vegas to return to Los Angeles at approximately 10 a.m.

### 4.  Evidence from the Scene

60.  Officers and medical professionals responded to the scene of R.W.'s murder, and a subsequent autopsy found that R.W. died from multiple gunshot wounds.

61.  The responders noted that R.W. was not dressed for the weather, which was cold and inclement on the night of the murder.  DNA was collected from R.W.'s ankle/sock area, consistent with the direction that R.W. was dragged into the desert off the highway.

62.  The DNA profile obtained was not complete, likely due to the aforementioned inclement weather on the night of the murder.  Analysis of HENLEY's DNA profile was inconclusive such that he could not be excluded as the contributor of the DNA. ROBINSON, on the other hand, was excluded as a potential contributor of the DNA found on R.W.

5.    HENLEY Arranges for Recording Equipment from the Studio to be Removed and Surveillance Video to be Destroyed

63.  Witness-1 told NLVPD detectives that D.S. (HENLEY's associate) removed video recording equipment from the studio a couple days after the homicide, including destruction of surveillance video data that would have shown R.W. and HENLEY at the studio shortly before R.W.'s murder.  Witness-2 told the FBI that HENLEY ordered Witness-1 and Witness-2 to leave the premises ("take a walk") prior to the removal of the video recording equipment.  Witness-1 explained that three relatively new surveillance and working DVR devices had been removed from the studio and all the security cameras were disabled.  Witness-1 stated that replacement DVRs were installed but that they did not work.

64.  Witness-3, who had previously installed the DVR equipment at the recording studio, also spoke with the FBI. According to Witness-3, on January 31, 2021, Witness-3 went to the studio to fix video cameras that were not working at the studio, after Witness-2 called Witness-3 to fix them.  Witness-3 analyzed the equipment and concluded the DVR system was

unplugged or turned off.  According to Witness-1, D.S. then sent
him money to purchase new DVR equipment for the studio.

65.  I believe that there is probable cause to conclude
that footage from the DVR system would have shown an altercation
between HENLEY and R.W. on the night of January 24, 2021, and,
at minimum, HENLEY and R.W. leaving the studio together shortly
before R.W.'s murder.

6.    Interviews of Family, Witnesses, and Big U
      Enterprise Associates

66.  On January 27, 2021, NLVPD detectives spoke with
R.W.'s family, which was the first time his family learned that
R.W. had died.

67.  On January 28, 2021, NLVPD detectives again spoke with
R.W.'s family.  Generally, his family confirmed that R.W. lived
in California and worked as a musician.  He was recently working
with a music producer, HENLEY, who was also from California, and
HENLEY had booked R.W.'s Airbnb and travel.  R.W.'s family
explained that R.W. was close with HENLEY and trusted him.
HENLEY coached R.W. in football since R.W. was young.  R.W.
lived with HENLEY for a time while in high school.  At some
point, HENLEY believed R.W. had worn a chain that belonged to
HENLEY's son to school without permission, and R.W. was kicked
out of HENLEY's home.

68.  P.M., R.W.'s aunt, added that she called HENLEY on
January 27, 2021, after learning R.W. had been killed.  HENLEY
claimed he had not seen or heard from R.W. and did not know his
whereabouts.  P.M. confronted HENLEY about arranging the trip

for R.W. to record in Las Vegas, and then, HENLEY admitted he
had done so.  P.M. had overheard HENLEY speaking with someone
named K.F. (whom investigators later interviewed) about R.W.'s
travel arrangements.  In a later interview during the pendency
of this investigation, P.M. said that HENLEY would call her on a
weekly basis prior to the murder, but after that call on January
27, 2021, P.M. never again heard from HENLEY.

69.  NLVPD also learned that C.A., a friend of R.W., spent
the weekend in Las Vegas and visited R.W. at R.W.'s Airbnb.
According to C.A., at about 2 a.m. on Sunday morning (January
24, 2021), HENLEY came to the Airbnb and asked R.W. why he did
not show up to the music studio the day prior (January 23,
2021).  R.W. claimed he did not have a ride to the studio.  C.A.
reported that it was odd that HENLEY actually took the time to
show up at the Airbnb in Las Vegas to confront R.W.  C.A. and
his family left for California Sunday afternoon (January 24,
2021) at about 2 p.m., and C.A. had not heard from R.W. since.

70.  Throughout the entire investigation, the family
members and friends who have been interviewed have pointed to
HENLEY as the person they believe to be responsible for R.W.'s
murder.  Within days, multiple people were sending Instagram
messages to HENLEY demanding answers for what happened to R.W.,
all of which went without response.

71.  NLVPD searched R.W.'s Instagram.  R.W.'s final
Instagram message to HENLEY, regarding the price of a song, was
sent on January 24, 2021, at 1:57 p.m.  HENLEY did not respond
until January 26, 2021, at 8:14 a.m. (almost 24 hours after

HENLEY left Las Vegas following R.W.'s murder).  In the meantime, the evidence shows that HENLEY had seen R.W. at the studio the night of January 24, 2021, after R.W. had sent that Instagram message, and HENLEY presumably would have discussed the price of the song at that time if at all.  Thus, it appears that HENLEY sent the message on January 26, 2021, in an attempt to plead ignorance that R.W. was murdered and to avoid suspicion from law enforcement of his involvement in the murder.

72.  On February 3, 2021, NLVPD conducted a recorded interview of K.F. (the person R.W.'s aunt heard HENLEY talking to about R.W.'s travel arrangements on January 27, 2021, as discussed above).  K.F. was the account manager for Uneek Music and handled the artists' travel needs and expenses.  K.F. used K.F.'s mother's Uber account to coordinate rides for R.W. while R.W. was in Las Vegas.

73.  K.F. confirmed he worked directly for HENLEY and had arranged for R.W.'s flight to Las Vegas.  R.W. was supposed to fly home Tuesday, January 26, 2021, possibly in the morning (i.e., over 24 hours after R.W. was seen leaving the Airbnb with his suitcase in the grey or silver sedan and then found dead).

74.  K.F. also arranged living accommodations for R.W. at the Airbnb for the week of January 19, 2021, through January 26, 2021.  Additionally, K.F. explained that part of his job was to arrange for transportation via Uber to and from the studio for R.W., who left two controllers and a jacket at the Airbnb that the Airbnb owner had contacted K.F. about.  K.F. used an Airbnb

application on his phone to make the reservation, but the account actually belonged to a friend named H.T.

75.   In reviewing the audio of this interview, it is clear that K.F. hesitated when answering several questions and appeared to be elusive about several answers.  K.F. claimed he did not have a phone number for HENLEY and had no way to get in touch with him.  K.F. eventually provided HENLEY's phone number but still claimed he did not know how to get in touch with him and did not know when he would see him again.

76.   K.F. also claimed he did not know the address of the recording studio in Las Vegas, even though K.F. was the person tasked with making the transportation arrangements for R.W. to get to the studio.  K.F. then stated that he merely provided CashApp transfers to R.W. so that R.W. could book the Uber rides, before backtracking and stating he did order Uber rides for him.  Similarly, K.F. claimed that he did not know the name of the music studio or the engineer R.W. was scheduled to work with.

77.   K.F. advised that R.W. made music and was supposed to make one song per day in Las Vegas.  K.F. said R.W. did not go to studio on January 19, 2021, was supposed to go every day after that, but probably did not go every day.  On one day, R.W. did not go and said he would double up the following day.  R.W. texted K.F. and said he was enjoying himself and was doing well. When K.F. called him, he did not answer.  K.F. texted him, but at a certain point, the text message went green instead of blue. The last time K.F. received a text message from R.W. was at

11:58 p.m. on January 24, 2021, less than two hours before his death.

78.  When the FBI attempted to interview K.F., he told them he did not want to speak with them.

79.  Soon after the interview of K.F., NLVPD located H.T. (whose account was used by K.F. to book R.W.'s Airbnb).  She explained that she did not authorize the use of her Airbnb account and was very upset about it.  She explained that her godbrother, K.F., used her Airbnb account to book a room in Las Vegas and then learned someone had been killed during that stay.

80.  H.T. explained that K.F. used her account to book the room but used his own credit card.  H.T. received a notification regarding the booking and asked K.F. why he used her account to book a room.  K.F. apologized and claimed he did not realize he booked it on her account.  At the time, H.T. said she did not think it was a big deal and did not press the issue.  H.T. did not know R.W. and explained that she worked in the medical field.

81.  Since K.F. had used H.T.'s Airbnb account to reserve the room, H.T. intercepted messages between the Airbnb host and K.F. and provided them to law enforcement.  H.T. saw a message from K.F. asking if the Airbnb property had video surveillance (prior to law enforcement speaking to K.F.) and confronted K.F. about the messages because she did not want her account to be associated with any problems.  K.F. told her about R.W.'s murder (again, before law enforcement spoke to K.F.) and said he was trying to figure out what happened to R.W.

### 7.  Title III Interceptions

82.  In 2023, after NLVPD attempted to interview parties about the murder, HENLEY and his associates made several inculpatory calls regarding the murder, which were intercepted by law enforcement pursuant to a Title-III wiretap.  First, NLVPD went to HENLEY's home at HENLEY'S 62ND STREET PREMISES when he was not there.  After leaving a business card and informing HENLEY's wife, S.H., that they were there following the two-year anniversary of R.W.'s homicide, were new to the case, and were just talking to everyone who was close to R.W., S.H. called HENLEY from HENLEY's father's phone.  S.H. had not done this before during the entirety of the wiretap.  HENLEY answered, "What's up, Dad?" -- further showing the anomalous nature of the call.  S.H. then explained that the detectives came by their home and were looking for him and talking to others.  HENLEY asked how many officers but was otherwise extremely circumspect.  In the hundreds of hours of calls captured that I have listened to, HENLEY's voice was notably and conspicuously different on this call.

83.  S.H. also lied to police, stating that HENLEY only lived at HENLEY'S 62ND STREET PREMISES sometimes.  In actuality, the FBI observed on surveillance and in months of cell-site location data that HENLEY was there most nights unless he was traveling.  After the call, HENLEY did not return home for two weeks -- again, something he had not done during the entirety of surveillance or cell-site location data received by law enforcement.  Moreover, that night, Victim-1 paid an extortion

fee to ROBINSON, who was driving HENLEY'S MERCEDES.  Again, ROBINSON driving HENLEY's MERCEDES was something that had not occurred before during the course of the investigation.  Based on my training and experience, I believe that HENLEY not returning home for two weeks and having one of his associates driving his car were attempts by HENLEY to avoid law enforcement regarding R.W.'s murder.

84.  On or about February 14, 2023, at approximately 12:05 p.m., HENLEY called MARTIN.  During the intercepted call, HENLEY told MARTIN he wanted to meet with him at MARTIN's auto shop to discuss the police investigation into R.W.'s murder.  The following is a transcription of a portion of the conversation:

**HENLEY:** Uhh five detectives went by my house this morning from uh Las Vegas.  And uh said they wanted to talk to me. You hear me?

**MARTIN:** Yeah

**HENLEY:** [U/I] Umm probably let you know.  [U/I] They was asking about [R.W.] and um told [static and call cuts out] um two-year anniversary, two-year anniversary, it was uhh they wanted to follow up and talk to everybody who was close, and um where you at?

**MARTIN:** I'm at the shop.

**HENLEY:** Alright I'm pulling up on you.

**MARTIN:** Aight.

85.  Based on other intercepts, I know that HENLEY believed the FBI may have been intercepting his telephone calls. Therefore, I believe HENLEY wanted to talk to MARTIN in person

regarding the murder in order to avoid speaking on a telephone line that may be intercepted by law enforcement.

86.  Following the call to MARTIN, HENLEY immediately placed multiple calls to D.S., the person who reportedly removed the video surveillance footage from the studio.  The first few calls were not answered.  Then, HENLEY told D.S. he needed to meet with him.  The following is a transcription of a portion of the conversation:

**HENLEY:** Where you at?

**D.S.:** At the house, ready to jump in the shower.  What you on?

**HENLEY:** I need to pull up on you.

**D.S.:** Aight.  I'm right here at the house.

**HENLEY:** Aight.  I gotta pull up on you and [UI]

**D.S.:** How long you gonna be?

**HENLEY:** You ain't bout to go nowhere, are you?

**D.S.:** Nah, I'm [UI].

**HENLEY:** Okay.

**D.S.:** I'll just jump in the shower though, just to be ready though.

**HENLEY:** Okay.

**D.S.:** Alright.  For sure.

87.  As discussed above, D.S. reportedly removed video surveillance evidence of HENLEY and R.W.'s presence at the studio hours before the homicide, namely all the security cameras and DVRs from the studio.

88.  On February 16, 2023, HENLEY was on the phone with D.S.  HENLEY told D.S. he was traveling to Las Vegas the following day where Witness-2 was located.  NLVPD had begun interviews of witnesses regarding R.W.'s murder, and I believe that HENLEY may have been going to Las Vegas to confront Witness-2 to see if he had talked to law enforcement.

89.  On February 21, 2023, HENLEY received a phone call from his son.  HENLEY's son told HENLEY that NLVPD called him about R.W. and suggested that detectives had spoken to S.H. and HENLEY already.  HENLEY told his son that nobody had spoken to the detectives and directed him not to talk to anyone anymore about R.W.

90.  The same day, HENLEY called S.H. to tell her that the NLVPD detectives had called their son about R.W. and what was said.  HENLEY told S.H. to call L.D. (L.D. is the mother of K.F., HENLEY's employee who booked victim R.W.'s travel arrangements and lied to investigators when questioned), but on FaceTime.[16]  HENLEY told S.H. to be careful about what she said over the phone.  S.H. said he had nothing to worry about.  When the FBI approached L.D. about this, L.D. hired a lawyer who told law enforcement that her client had no memory of this and had nothing to do with it.

---

[16] During the course of the Title III interceptions, I listened to multiple calls in which HENLEY directed those who want to discuss illegal activity to contact him on FaceTime or WhatsApp.  I believe that HENLEY did so because those applications are encrypted, and HENLEY suspected that his phones were wiretapped at various times.

91.  The same day, HENLEY called MARTIN and told him he had been trying to reach him (on his other phone, possibly via FaceTime).  MARTIN said he was going to go get his other phone.  HENLEY requested MARTIN to call him.

92.  Later the same day, HENLEY called MARTIN to confirm that he was at MARTIN's auto shop.  HENLEY told MARTIN he was on his way to meet with MARTIN at his auto shop.

93.  Still later, HENLEY called ROBINSON.  ROBINSON was at one of HENLEY's homes, and HENLEY said he was heading to meet ROBINSON.

94.  Based on my training and experience and knowledge of the investigation, I believe HENLEY was contacting Big U Enterprise members and associates -- specifically those with knowledge of R.W.'s murder -- to ensure that any statements to law enforcement were either suppressed or consistent with one another.

**E.   Robbery in Violation of the Hobbs Act and as Racketeering Activity**

95.  According to witnesses, including Victim-1, and corroborated repeatedly by the wiretap and recorded meetings with Big U Enterprise members, the Big U Enterprise sets up and executes robberies throughout Los Angeles.  Normally, HENLEY provides the target and location while the robbery is committed by the Big U Enterprise or at the Big U Enterprise's direction using the Rollin' 60s or other associates.  The Big U Enterprise, as well as the individuals who personally commit the robberies, will take a cut and then often sell the robbery

proceeds or give the robbery proceeds back to a victim as a
power grab and to instill fear of future robberies or violence.

      1.   HENLEY Directs a Robbery of and Conspires to Rob,
           and ROBINSON and WILLIAMS Personally Rob, a
           Marijuana Dispensary at Gunpoint

96.  One such robbery occurred on July 5, 2021, at an
unlicensed marijuana dispensary in Los Angeles where Victim-1
worked.  Leading up to the robbery, the Big U Enterprise had
been extorting Victim-1 for years, and Victim-1 had been paying
the Big U Enterprise up to $25,000 per month when Victim-1 was
at the top of his earning capacity.  Shortly before the robbery,
however, Victim-1 had ceased paying extortion to the Big U
Enterprise, as Victim-1 did not believe it was necessary or that
he was receiving any benefit from the payments.

97.  On the day of the robbery, approximately 11 of the Big
U Enterprise's members and associates, including ROBINSON and
WILLIAMS, both of whom Victim-1 knew well, as well as Rollin'
60s members, rushed into the dispensary armed with firearms and
without masks.  They demanded belongings of anyone inside and
stole cash and marijuana from the store before fleeing.[17]  At one
point, they demanded a Rolex watch from one of the co-owners,
but at ROBINSON's direction, they ended up letting him keep it.
According to Victim-1, while still at the dispensary, the

---

[17] See Taylor v. United States, 579 U.S. 301, 309 (2016)
("[T]o satisfy the [Hobbs] Act's commerce element, it is enough
that a defendant knowingly stole or attempted to steal drugs or
drug proceeds, for, as a matter of law, the market for illegal
drugs is 'commerce over which the United States has
jurisdiction.'").

robbers put Victim-1 on the phone with HENLEY, who invited Victim-1 to HENLEY's home.

98. According to Victim-1, when Victim-1 arrived at HENLEY's ARLINGTON PREMISES, ROBINSON, WILLIAMS, and other robbers were there, as were the proceeds of the robbery. Inside, HENLEY told Victim-1, "That's how you rob yourself." HENLEY then demanded $10,000 from Victim-1 to ensure other robberies did not occur. HENLEY also directed Victim-1 to identify other businesses or dispensaries that could be similarly robbed and assured Victim-1 that the Big U Enterprise would compensate him for identifying any robberies.[18] HENLEY then provided a portion of the robbery proceeds back to Victim-1.[19]

99. WILLIAMS later admitted to this robbery and the aftermath on a podcast. On the "No Jumper" podcast, after stating that WILLIAMS was HENLEY's "righthand man," WILLIAMS explained, "So, basically . . . he'll manipulate things. We'll go and 'do something,' and then, the same niggas we do it to show up to the house like 10 minutes later as we trying to count everything. And we be like how the fuck?" WILLIAMS then said that HENLEY would state, "Well, we just going to give like $40,000 back." "Wack 100," who is a rival/counterpart of HENLEY's for the Bloods, was also on the podcast and stated,

---

[18] As stated below, Victim-1's account is corroborated in a consensually recorded conversation in which HENLEY and ROBINSON ask for robbery targets from Victim-1.

[19] This modus operandi is corroborated by wire interceptions in which HENLEY discusses robbing drug dealers of only half of their product or proceeds.

"You know why he wanted to give the dude back the $40, right?
Because he was going to make the dude give him $20 for getting
it back." WILLIAMS then agreed, "Of course. He did that to"
two famous rappers. WILLIAMS then detailed demanding $50,000
from the celebrity rapper R.R. or they would kill the celebrity
rapper M.M. WILLIAMS then said R.R. dropped off the $50,000,
and HENLEY stopped answering the phone and then did not share
any of the proceeds with WILLIAMS. According to further "No
Jumper" and "VladTV" segments, HENLEY then served a cease-and-
desist order on "No Jumper," and this podcast episode was
removed from the platform, although a recording of the episode
remained available elsewhere online.

100. WILLIAMS's recounting of this robbery occurred years
after the robbery of Victim-1's dispensary and years after
Victim-1 had already recounted and documented the robbery for
the FBI.

2.  <u>WILLIAMS Continues to Commit and Discuss
Robberies and Other Violent Acts</u>

101. Lately, WILLIAMS has claimed in multiple interviews
that he is no longer affiliated with Big U, whom he now refers
to as "Big Useless" or "Big Uterus." However, WILLIAMS
continues to discuss former Big U Enterprise business, to
discuss and threaten violent assaults and robberies, and to
actually commit the same.

102. For example, on January 3, 2025, outside of the "No
Jumper" podcast filming location in Los Angeles, WILLIAMS struck
a victim in the head multiple times with a firearm and pointed

the firearm at the back of his head, while two other suspects removed valuables from the victim -- including jewelry, cash, and a cellphone -- in excess value of $5,000. The victim lost consciousness during the incident which was captured on video and posted to social media, apparently to stoke fear and boast of WILLIAMS's penchant for violence. After the incident, WILLIAMS posted a seven-minute video on his YouTube channel discussing the beating, stating that he used to be "Big Useless's enforcer," that he "love[s] to fight," and that the incident "could have went a lot worse." WILLIAMS's post also played a portion of the assault.

103. Similarly, on February 25, 2025, WILLIAMS posted a video on his YouTube channel in which he threatened anyone that is at odds with him to "do something bad to you, your momma, your daddy, anybody." In that same video, WILLIAMS walked through the checking in process and walked through the fact that he would rob any celebrity who did not check in, including at an Airbnb, a restaurant, a carwash, or anywhere. WILLIAMS also said that he was with HENLEY when rapper Rakim Hasheem Allen, aka "PnB Rock," was robbed and killed, that they told him to comply, and that they would get the jewelry later. WILLIAMS also walked through the kidnapping of a famous rapper that WILLIAMS and HENLEY committed together[20] and then discussed several Big U Enterprise associates being good in Los Angeles because they have checked in (some of those mentioned were

_____

[20] According to WILLIAMS's statements in a publicly available online video, he kidnapped a victim, put him in the trunk of his car, and drove him to HENLEY's home.

Developing Options' donors, or former NBA players, who have provided hundreds of thousands of dollars as purported "gifts" to HENLEY personally).

104. In February 2025, WILLIAMS also took part in a filmed conversation with multiple people on YouTube, in which WILLIAMS told another participant that "you will lose your life," and then, when WILLIAMS "found" him, WILLIAMS was going to "do something bad to" him.

### 3.  Further Evidence of the Big U Enterprise's Involvement in Robberies

105. Throughout this investigation, the FBI obtained many recordings of Big U Enterprise members and associates discussing robberies that they were committing or planning to commit.  For example, on August 6, 2021, on a recorded call, ROBINSON told Victim-1, "Tryna lick somebody, that ain't even hard.  [U/I] All this shit, it's just, this ain't workin, man.  I'm like, 'Man, I'm in the wrong business, homie.'"  In my training and experience, and investigation into this case, "lick" is consistently used as slang for robbery.

106. Similarly, on June 22, 2022, on another recorded call, ROBINSON told Victim-1 that HENLEY had been asking ROBINSON if they needed to do a "takeover" (which I know, based on my training, experience, and participation in this investigation, to mean a takeover robbery) of Victim-1 at his marijuana dispensary again because Victim-1 had not paid his extortion payments.  Then, on July 9, 2022, HENLEY told Victim-1, "We gotta rob someone.  You with that bullshit."  On July 31, 2022,

HENLEY told Victim-1 that HENLEY needed $30,000 to pay his Developing Options staff and was considering a robbery and increased extortions to obtain the funds.

107. HENLEY was also intercepted on a telephone call telling an auto shop owner that HENLEY knew how much he had paid the shop owner because the payment was proceeds of a robbery.

108. In other Title III wiretap interceptions, I also heard HENLEY planning a robbery of individuals that had stolen equipment from a celebrity rapper. Using an Apple AirTag that was purportedly with the equipment, HENLEY, MARTIN, and others obtained firearms and began to stage the robbery to get back the equipment. However, when they arrived, the police also arrived, having been called by the celebrity rapper. I witnessed the staging of the robbery on surveillance before it was called off.

109. On November 11, 2022, on another intercepted call, Mitchell (discussed above) and HENLEY coordinated how Mitchell would give HENLEY the proceeds from a robbery that Mitchell committed. HENLEY and Mitchell were talking about how much money should go to HENLEY. Then, in multiple other intercepted calls and text messages, HENLEY talked with BLANTON and ROBINSON to help HENLEY collect from Mitchell's associate. Talking about Mitchell, BLANTON said, "They robbed a nigga for some shit . . . . They made a nigga call his plug, and then, they booked him." Talking about further splitting the proceeds, HENLEY told BLANTON, "I'ma grab half of that whatever he got them. I'm give it to Vey . . . , and Vey can bring the rest of you."[21] On a

---

[21] "Vey" is ROBINSON's moniker.

subsequent call, I heard HENLEY counting out the money and saying that it "ain't nothing but two to three racks."  BLANTON responded, "Bricc Baby said it was 'pose to be between five to seven, man.  Gotta make that call out to Bricc man."[22]  On April 11, 2023, HENLEY and BLANTON again discussed an individual who was supposed to be robbed in the near future.

### F.    Extortion in Violation of the Hobbs Act and as Racketeering Activity

110.  A significant portion of the Big U Enterprise's conduct consists of various extortion schemes in Los Angeles. In addition to the "check in," the Big U Enterprise extorts both legitimate and illegitimate businesses alike, though it tends to focus on the lower-hanging fruit of illegitimate or "grey-market" businesses.  One of its extortion victims, Victim-1, was a promoter and marketer who profited from club promotions, operating in interstate commerce, and worked for illegal or quasi-illegal marijuana dispensaries.  As shown in the recorded conversations and controlled payments, HENLEY and ROBINSON were quite open in their threats of violence and intimidation if the victims did not pay the Big U Enterprise.  As stated above, the July 5, 2021 robbery was key to their scheme of extorting Victim-1 in that once Victim-1 stopped paying extortion fees to the Big U Enterprise, they robbed him to reinstate their control.

111.  At one point, Victim-1 asked in a recording what he was paying for, and ROBINSON explained that it was like a

---

[22] "Bricc Baby" is one of Mitchell's monikers.

retainer and that if and when Victim-1 was robbed, Victim-1 would not have to pay extra money to the Big U Enterprise for the return of his property.  Of course, as discussed above, it was Big U Enterprise members and associates who were the ones who had robbed Victim-1, and they did "charge" Victim-1 for giving his things back (by not returning the entirety of the property they themselves stole and demanding more money and targets to rob).

112. The evidence supporting the Big U Enterprise's extortion activities includes: (1) consensual recordings made by Victim-1 of phone calls, meetings, and controlled extortion payments; (2) statements describing being a victim of the extortion scheme from Victim-1; (3) Title III wiretap calls discussing extortions and payments; and (4) threats made to other individuals on Title III wiretap calls showing the modus operandi of the Big U Enterprise's extortion racket.

113. Examples of some of the extortion-related recordings obtained during this investigation include (controlled payments with the FBI's involvement are bolded):

- 7/9/2021: four days after the Big U Enterprise robbed Victim-1 as discussed above, consensually monitored call with Victim-1 in which ROBINSON tasked Victim-1 with identifying additional robbery victims for HENLEY and ROBINSON -- where Victim-1 would receive 25% -- and noting that HENLEY was discussing that Victim-1 owed HENLEY money, having only paid a portion of what Victim-1 "owed";

- 9/2/2021: consensually recorded call in which HENLEY stated that any payments that Victim-1 receives from another person HENLEY is extorting (i.e., "D.C.") must be paid to HENLEY;

- 9/3/2021: consensually recorded call in which ROBINSON told Victim-1 that ROBINSON needed to tell HENLEY something about the amount of money that Victim-1 would be paying to HENLEY, and Victim-1 said he could pay $500 or $1,000;

- 9/15/2021: consensually recorded call in which ROBINSON asked Victim-1 what he has for HENLEY, and ROBINSON discussed how much Victim-1 can pay but ultimately promised to cover for Victim-1 and allow him to pay the following day rather than face HENLEY's anger;

- 9/20/2021: consensually recorded call in which HENLEY and Victim-1 discussed how much money will go from an event to HENLEY, the Rollin' 60s, ROBINSON, and Victim-1; HENLEY stated that he wanted his money; later in the day, Victim-1 and ROBINSON discussed how Victim-1 was being taxed by ROBINSON and HENLEY;

- 9/23/2021: consensually monitored call in which HENLEY discussed how another extortion victim (i.e., "D.C.") was not paying HENLEY what he was owed because D.C. was conducting business in Los Angeles;

- 10/19/2021: consensually recorded call in which HENLEY stated that he was "taking over the account" (referring to "D.C.") and that he would be taking every fifth table that is sold at "D.C.'s" club;

- 10/22/2021: consensually recorded call in which HENLEY asked Victim-1 why he was on the phone with him when he was coming to pick up his money right now; they then discussed how much will be paid electronically and how much in cash; later that day, ROBINSON provided Victim-1 with the number to pay an associate "Tubs" for HENLEY;

- 11/10/2021: consensually recorded call in which HENLEY told Victim-1 to get a cannabis shop up and running for him to "pay some rent";

- 11/29/2021: consensually recorded call in which ROBINSON told Victim-1 to give HENLEY a weekly salary of $1,000; ROBINSON further advised that Victim-1 gets in trouble when promising larger amounts; ROBINSON also asked Victim-1 where "D.C." lived because he and

HENLEY were trying to "fuck D.C. up" based on his nonpayment referenced above;

- o **The FBI provided $500 in cash for the meeting, and Victim-1 paid that money to HENLEY;**

- 12/11/2021: consensually recorded call in which ROBINSON asked how much money Victim-1 had for HENLEY and that "well, I think he's gonna want at least a thousand";

- 12/17/2021: consensually recorded call in which ROBINSON asked Victim-1 how much he will have; they discussed both cash and electronic payments; the following day, they continued a similar discussion regarding $1,000 to $2,000 in payments;

- 1/20/2022: consensually recorded call in which ROBINSON arranged a meeting that was also recorded; **the FBI provided $1,000 in cash that Victim-1 paid to ROBINSON for HENLEY;** in the discussion, Victim-1 discussed how HENLEY took the entire $30,000 from Déjà Vu, which is discussed further below in connection with HENLEY, ROBINSON, and MARTIN extorting $30,000 on December 2, 2021; ROBINSON explained to Victim-1 that he has taken way more than that and discussed HENLEY's spending after receiving payments;

- 2/17/2022: consensually recorded call in which Victim-1 requested an extension from ROBINSON regarding a payment; ROBINSON told Victim-1 that he had been holding HENLEY off and that HENLEY had been asking for Victim-1's payment;

- o **The FBI provided $1,000 in cash that Victim-1 paid to ROBINSON on camera for HENLEY;**

- 2/19/2022: consensually recorded call in which HENLEY called Victim-1 and said, "Bring me; I need $1,500 real quick"; Victim-1 told HENLEY that he had just paid ROBINSON $1,000 two days prior;

- 4/3/2022: consensually recorded call in which ROBINSON told Victim-1 that HENLEY was increasing Victim-1's taxes to $3,500;

- 4/9/2022: consensually recorded call in which ROBINSON told Victim-1 that other individuals were paying the Big U Enterprise $2,500 to $3,000 so that HENLEY could purchase a $30,000 necklace for his wife's birthday;

- 4/10/2022: consensually recorded call in which ROBINSON told Victim-1 that HENLEY wanted to collect $2,000 from Victim-1 every Monday;

- 4/16/2022: consensually recorded call in which HENLEY told Victim-1 that he needed a donation for his wife's birthday; Victim-1 told HENLEY he had already paid ROBINSON, and HENLEY responded that his math was wrong;

- 6/5/2022: consensually recorded call in which ROBINSON and HENLEY demanded that Victim-1 stop doing business with the Big U Enterprise's rival "Wack 100" because he was a rat;

- 6/22/2022: ROBINSON told Victim-1 that HENLEY had been asking for money from Victim-1 and that HENLEY asked if they needed to do a "takeover" of Victim-1, as they had with the previous armed robbery of Victim-1's marijuana dispensary;

- 7/14/2022: consensually recorded call in which ROBINSON told Victim-1 that HENLEY was angry and needed $2,000 from Victim-1;

- 7/21/2022: consensually recorded call in which HENLEY demanded money from Victim-1; HENLEY told Victim-1 that he needed the money for taxes and EDD (i.e., Employment Development Department);

- 7/31/2022: consensually recorded call in which HENLEY told Victim-1 that he needed $30,000 in the next couple weeks to pay his Developing Options staff and was considering a robbery and increased extortion payments to obtain the funds; HENLEY specifically said he did not care if they had to rob Peter to pay Paul, they needed to "get down" (i.e., slang for robbery);

  o **Victim-1 then paid HENLEY $1,500 (of his own money) on camera**; HENLEY said "we bumped the weekly down to $1,500";

- 8/4/2022: consensually recorded call in which ROBINSON told Victim-1 that he needs to pay;

- 8/9/2022: **Victim-1 paid ROBINSON $1,500 from the FBI on camera**; ROBINSON and Victim-1 discussed the history of payments Victim-1 had made to HENLEY and that ROBINSON, according to ROBINSON, "did all the work"; HENLEY then arrived at the location;

- 9/7/2022: consensually recorded call in which ROBINSON told Victim-1 he needed money, followed by ROBINSON consulting on Victim-1's anxiety and fear of HENLEY, how Victim-1 can get more time to make a payment, and how to calm down HENLEY by paying a portion of what he is owed;

- 9/15/2022: consensually recorded call in which ROBINSON asked what time Victim-1 would meet for money;

  - **Victim-1 then paid ROBINSON $2,000 of FBI-provided funds on camera**; during the conversation, Victim-1 asked what he was paying for; ROBINSON said, "If anyone come rob you, you ain't gotta pay extra money to get your shit back"; ROBINSON described it as a street shield (Victim-1, though, has told agents that only ROBINSON and HENLEY have robbed him); in this same meeting, ROBINSON told Victim-1 that HENLEY was the buffer and that HENLEY was the only OG still actively killing people;

- 9/21/2022: consensually recorded call in which ROBINSON asked Victim-1 for his location so they could get the payment out of the way;

  - **Victim-1 then paid ROBINSON $1,000 (of his own money) on camera**;

- 9/28/2022: consensually recorded call in which ROBINSON arranged to meet Victim-1 for payment;

  - **Victim-1 then paid ROBINSON $2,020 (of his own money) on camera**;

- 10/2/2022: consensually recorded call in which ROBINSON told Victim-1 that if he was not in the

middle of Victim-1 and HENLEY, it would "be very, very bad"; ROBINSON also stated that there are two people that owe the Big U Enterprise $200,000 and ROBINSON had yet to threaten them;

- 10/5/2022: consensually recorded call in which ROBINSON wanted to pick up payment for HENLEY;

  o **Victim-1 then paid ROBINSON $2,000 of FBI-provided money on camera**;

- 10/21/2022: consensually recorded call in which HENLEY chastised Victim-1 because someone associated with Victim-1 stated that he was working with HENLEY; HENLEY told Victim-1 that Victim-1 had to pay HENLEY for Victim-1's associate using his name; Victim-1 told HENLEY that he had nothing to do with it and questioned how to get the money from him; HENLEY repeatedly said to tie him up if that was necessary but that HENLEY would not get involved; in the same call, HENLEY said that if Victim-1 paid his rent, he would let him off for the weekly tax payment;

- 11/3/2022: intercepted call between HENLEY and ROBINSON in which HENLEY said they needed to "fix that mothafucka up and get our money";

- 11/10/2022: **Victim-1 paid ROBINSON $2,000 from the FBI on camera**; ROBINSON told Victim-1 not to answer if HENLEY called him because HENLEY was demanding $5,000 from him that day;

- 12/1/2022: **Victim-1 paid ROBINSON $2,000 on camera**; $640 was Victim-1's own money; ROBINSON told Victim-1 that ROBINSON was taking 25 to 50% of the payments to HENLEY, depending on the amount; ROBINSON then quoted HENLEY as saying that ROBINSON was getting "soft" with Victim-1, that HENLEY was going to "fuck up" Victim-1, and that ROBINSON was the only one saving Victim-1;

- 12/7/2022: HENLEY called Victim-1 and stated that Victim-1 owed HENLEY a lot of money and to bring $2,000 weekly;

- 2/15/2023: **Victim-1 paid ROBINSON $500 (of his own money) on camera**;

- 3/29/2023: **Victim-1 paid ROBINSON $1,500 of FBI-provided money on camera**; ROBINSON said he was going to tell HENLEY that Victim-1 only paid him $1,000.

114. Additionally, HENLEY, ROBINSON, and MARTIN extorted Victim-2 at Déjà Vu, an international adult entertainment club, at a location in Los Angeles, on December 2, 2021, which ROBINSON and Victim-1 later discussed on the consensually recorded call on January 20, 2022, discussed above. As corroborated by recordings and interviews with Victim-1, as well as public social media posts, HENLEY organized a birthday party at Déjà Vu for himself and negotiated that he would receive roughly 33% of the bar proceeds from that night. HENLEY also promised that famous rappers would attend. He later then demanded the full profits from the night and threatened extreme violence if he was not paid the entire amount.

115. Specifically, on December 2, 2021, on another consensually recorded call, HENLEY called Victim-1 to discuss the extortion payment related to HENLEY's birthday party at Déjà Vu. Victim-1 previously promoted Déjà Vu and had initially connected Victim-2, the new promoter, with HENLEY about having HENLEY's birthday party there. Victim-2 had agreed to pay HENLEY $30,000 in exchange for celebrity rappers, including Cameron Jibril Thomaz, aka "Wiz Khalifa," and Clifford Joseph Harris Jr., aka "T.I.," as well as other famous guests, to accompany HENLEY to Déjà Vu for his birthday on December 2, 2021. Déjà Vu promoted the event on social media using Wiz Khalifa's image, which would bring in more customers who wanted to party with those famous celebrities.

116. The following is a transcription of a portion of the conversation between Victim-1 and HENLEY the day of the party:

**Victim-1:** I was trying to get you about $20,000.

**HENLEY:** $30,000.

**Victim-1:** I sold it for 30, the whole thing for 30, and I got to get all the people . . . .

**HENLEY:** $30,000!  Cuz this shit is viral, and it's all over the city.  Got me into it with my wife and everybody else, and that's the number you told me.

**Victim-1:** But if Wiz don't come . . . .

**HENLEY:** [Yelling at Victim-1] Nigga, I wouldn't give a fuck!  I'll tear that bitch up!  It won't be a club there no more!  You don't tell me if Wiz don't come, nigga!

**Victim-1:** But Unc, it's what I sold.

**HENLEY:** I wouldn't give a fuck you knew T.I. weren't never coming.  And T.I. said he was getting the muthafucking drop, so that's on Vey if he ain't get it.  That's on you and Vey.  I don't wanna hear nothing.  You ain't gon' use my name all over this muthafucker, and you need to bring me the money now!

**Victim-1:** I'm getting it from Tubs and them later on in like two to three hours.  They gon' let me borrow some money.

**HENLEY:** Matter fact, I'ma have my niece 'n 'em to come and get it.

117. Later in the call, Victim-1 and HENLEY discussed various business details related to booking the event at the

club and the revenue Victim-2 was expected to earn from the event. HENLEY described his expectations for the event and said there were "going to be 5,000 Six-O's in this, in this muthafucker that's going to be pulling up, and if we got to tear that muthafucker up, we going to tear it up. So be ready for that, be ready for that. Bring me my money!"[23]

118. The night of December 2, 2021, HENLEY, ROBINSON, MARTIN, and countless Big U Enterprise associates showed up to Déjà Vu. Wiz Khalifa, T.I., and the other promised guests did not arrive as promised. Victim-1 watched as ROBINSON, MARTIN, and three other associates took Victim-2 into a backroom and extorted $30,000 from him before returning to the main room to party. Not only had they demanded a flat payment of $30,000 but also 30% of all proceeds from the party that night was advertised as going to Developing Options.

**G. Transportation of Individuals in Interstate Commerce with Intent that the Individuals Engage in Prostitution in Violation of the Mann Act and as Racketeering Activity**

119. In November 2022, HENLEY paid AFLLEJE $1,000 to transport three women from the Central District of California to Las Vegas, Nevada, to engage in prostitution and other crimes under Nevada law (i.e., Pandering, in violation of Nevada Revised Statutes Section 201.300, and Prostitution Outside of Licensed House of Prostitution, in violation of Nevada Revised Statutes Section 201.353).

---

[23] Based on my training, experience, and participation in this investigation, I know that Six-O's is a reference to Rollin' 60s members.

120. During the Title-III wiretap, the FBI intercepted
calls and text messages between HENLEY and AFLLEJE.  Those
communications include a call between HENLEY, AFLLEJE, and an
unidentified male when HENLEY talked about a Vegas trip and told
the man on the phone with them that AFLLEJE "goin' make every
bitch get naked 'right there bitch get naked.  Give my brother
some head.  Right now'" and "she goin' make a bitch break down
go to work.  Ain't no playin'."

121. Following the intercepted communications, LAMTFVG
investigators interviewed AFLLEJE in June 2023 at her residence.
In the interview, although she initially denied her involvement
with pimping and pandering, AFLLEJE ultimately admitted to
promoting prostitution, noting she was known for "bringing the
hoes."  AFLLEJE said that she did not consider herself a pimp
but "created environments for women to do actions and make
money."  AFLLEJE told LAMTFVG she provided HENLEY with women as
long as they were paid.  That representation is corroborated by
a series of intercepted calls from January 2023, when AFLLEJE
said she was bringing seven women to HENLEY and, after which,
HENLEY talked to AFLLEJE and others about her being upset when
they do not get paid right away.  According to AFLLEJE, she told
her women, "Cash before smash."

122. When investigators confronted her with an intercepted
call between her and HENLEY on November 10, 2022, which is
discussed below, AFLLEJE confirmed receiving a Zelle payment of
$1,000 from HENLEY.  She advised that the $1,000 payment was for
her to close her food truck, accompany him to Las Vegas to cook

food, and transport the women with her.  The is corroborated by
the intercepted messages and phone calls.  At the end of the
trip, on November 18, 2022, HENLEY sent AFLLEJE a $500 payment
on Zelle.

123. At the interview, LAMTFVG investigators requested that
AFLLEJE meet them the following day at the FBI Los Angeles Field
Office to download the contents of her cellphone.  AFLLEJE was
advised not to speak with HENLEY or anyone else about the
interview.

124. However, subsequent intercepted communications between
HENLEY and others, including AFLLEJE, showed that after
AFLLEJE's interview, she met with HENLEY and other Big U
Enterprise associates to discuss her interaction with law
enforcement.  Those calls started right after the interview,
with an associate calling HENLEY demanding to talk to him
immediately about him and "Mani" (AFLLEJE).  On that call,
HENLEY made sure that the caller kept AFLLEJE where she was at
so that HENLEY could meet up with her about it.  The next day,
HENLEY and AFLLEJE talked on the phone about what "happened
yesterday" (i.e., the day of her interview with LAMTFVG and the
day she apparently met up with HENLEY).  AFLLEJE asked HENLEY if
he was okay and complained that "they" (presumably law
enforcement) were just trying to "paint a picture."

125. AFLLEJE did not meet at the FBI Los Angeles Field
Office the day after her interview with LAMTFVG, as she had
agreed to do, and has not otherwise cooperated with law
enforcement since meeting with HENLEY following her interview.

126. On other later-intercepted calls, HENLEY complained to associates about LAMTFVG's meeting with AFLLEJE.  For example, on June 29, 2023, an associate asked HENLEY if he received the photograph of the business card investigators left her three days earlier when they interviewed the caller about HENLEY, and told him they had asked about $95,000 she had deposited in her bank account per HENLEY's instructions.  Unprompted, HENLEY told her they approached a woman he was having sex with (AFLLEJE) and talked to her about how HENLEY was trying to buy girls and be a pimp.  HENLEY said he was stressed out and that his lawyer told him to stay off the phone.

127. The next day, on June 30, 2023, HENLEY told another caller that investigators had told AFLLEJE that she was going to be charged with sex trafficking based on a recording they had of HENLEY telling one of his partners that AFLLEJE can find girls when they want to go out of town.  HENLEY said, "Shit, so you gonna get me and say my crime is sending girls money for sex.  Is that my crime?  Adult girls too.  You hear me?  It's not like it's some kids.  Not like it's a boy.  We're talking about grown ass women."

**H.  Fraud in Violation of Federal Wire Fraud and Bank Fraud Statutes and as Racketeering Activity**

    1.  <u>Economic Injury Disaster Loan Program Fraud</u>

128. Through Uneek Music, HENLEY, on behalf of the Big U Enterprise and the entities it controls, also committed fraud intended for COVID-19 pandemic related disasters.  According to Secretary of State filings for Uneek Music, HENLEY is its CEO.

He also controlled a business checking account in the name of
Uneek Music Entertainment, Inc. with Bank of America (the "Uneek
Music Account").  In 2020, HENLEY defrauded the SBA of a $90,000
loan through the Uneek Music Account under the Economic Injury
Disaster Loan ("EIDL") Program.

129. The SBA administered EIDL to provide low-interest
financing to small businesses affected by declared disasters.
In or about March 2020, Congress passed the Coronavirus Aid,
Relief, and Economic Security ("CARES") Act, which authorized
the SBA to provide EIDL loans of up to $2,000,000 to eligible
small businesses experiencing substantial financial disruption
as a result of the COVID-19 pandemic.

130. To obtain an EIDL loan, a qualifying small business
was required to submit a loan application through the SBA's
online web portal.  In the EIDL loan application, the applicant
was required to provide, among other information, the gross
revenue for the twelve months preceding January 31, 2020.

131. As part of application and to be eligible to obtain
the EIDL loan, the applicant was required to make certain
certifications under penalty of perjury.  The applicant was
required to certify that "all information in [the] application
and submitted with [the] application [was] true and correct to
the best of [the applicant's] knowledge" and that the applicant
would "submit truthful information in the future."  The
application included a warning that "any false statement or
misrepresentation to the SBA [could] result in criminal .  .  .

sanctions including, but not limited to . . . fines and imprisonment, or both."

132. On June 16, 2020, HENLEY electronically submitted an EIDL application from Los Angeles for Uneek Music -- which I have reviewed -- in which he falsely represented that Uneek Music had 2019 gross revenues of $500,000 and cost of goods sold of $300,000. The true financial records, that were obtained through the course of this investigation, show that these representations made by HENLEY on the application forms were false.

133. Based on the bank records, Uneek Music was operating at an approximately $5,000 loss in 2019. Specifically, the total amount of money that came in was approximately $30,000 and the total amount of money that went out was approximately $35,000. Nevertheless, HENLEY claimed that Uneek Music was operating at a $200,000 profit in 2019. Those fraudulent misrepresentations caused the SBA to give Uneek Music a $90,000 loan (less the $100 that was taken out as the application fee) and $10,000 grant. In documents produced in response to a subpoena, newly created financial documents for Uneek Music also show that the claims to the SBA are false, as the documents show Uneek Music operating at -72.57% profitability and only $15,500 in total revenue.

134. On June 24, 2020, from Los Angeles, HENLEY electronically signed a loan agreement between Uneek Music and the SBA in which he certified that all representations in his application were true, correct, and complete. Then, on June 26,

2020, HENLEY accepted from the SBA a transfer of approximately $89,900 into the Uneek Music Account based on the fraudulent June 16, 2020 loan application and fraudulent June 24, 2020 loan agreement. On July 7, 2020, HENLEY accepted from the SBA a transfer of approximately $10,000 into the Uneek Music Account based on that fraud.

135. The electronic transmissions of the documents and wire transfers of the funds traveled between Los Angeles and other states.

### 2. Wire Fraud Through Embezzlement of Charitable Donations

136. The investigation in this matter has also revealed that HENLEY has committed wire fraud through embezzling donations to Developing Options. For the purpose of executing his scheme to defraud, HENLEY transmitted, and caused the transmission of, multiple checks and transfers of items by means of wire communication in interstate or foreign commerce. As discussed below, the FBI and IRS-CI have traced his embezzlement of funds that were paid by victims meant as charitable donations. I have reviewed bank records for Developing Options' bank account, HENLEY's personal bank account, as well as donations and information provided by the donors to determine the following:

> a. *HENLEY Embezzles $20,000 from a Donation from a Current NBA All-Star to Developing Options*

137. On August 20, 2019, Developing Options received a $20,000 donation from a current NBA All-Star ("Donor-1"). The

wire transfer identified the donation as for "charity." Donor-1 confirmed he provided charitable donations to Developing Options.

138. HENLEY, however, embezzled the entire $20,000 donation by transferring the funds into his personal checking account the day after Developing Options received the funds from Donor-1.

139. Donor-1 was also heard on intercepted calls asking for confirmation of the charitable contribution.

> b.  *HENLEY Embezzles $14,000 from a Donation from Donor-2 to Developing Options*

140. In early 2020, Developing Options received a $24,000 donation from Donor-2, an award-winning music publishing company. J.B., President of Donor-2, issued and signed the check, dated January 31, 2020, which cleared Developing Options' bank account on February 3, 2020. Investigators interviewed Donor-2's custodian of records and CPA, and received documentation for the following:

141. J.B. believed the $24,000 donation would provide football equipment for a local not-for-profit organization, and deducted $24,000 as a charitable donation on his personal tax returns. Instead, HENLEY embezzled $14,000 of the donation by transferring the funds into his personal checking account. HENLEY made that transfer one day after the donation check, which HENLEY endorsed on behalf of Developing Options, cleared the Developing Options bank account. Donor-2 did not authorize any portion of the funds donated to Developing Options to be given to HENLEY personally.

> c.  *HENLEY Embezzles $15,000 from a Donation*

*from Donor-3 to Developing Options*

142. On November 3, 2021, Developing Options deposited a $19,000 donation check from Donor-3, a popular, online content platform. At the time, Donor-3 was helping HENLEY produce the "Checc'n In" podcast. The purpose of the payment was a donation to support the Crenshaw Rams youth football team. Donor-3 sent the donation in response to HENLEY's invoice on Developing Options letterhead, which FBI and IRS-CI agents obtained a copy of, stating that Developing Options was going to use the donation to purchase uniforms for the Crenshaw Rams youth football team. Instead, HENLEY embezzled $15,000 of the donation by transferring the funds into his personal checking account one day after the donation check cleared the Developing Options bank account.

143. I have confirmed that the Donor-3 check was from a J.P. Morgan Chase bank account utilizing servers outside of California and was deposited at a branch here in Los Angeles. The Bank of America branch utilized servers in Richardson, Texas. The same day, HENLEY transferred the money from the Developing Options Bank of America account to his personal Bank of America account, which again utilized servers in Richardson, Texas, to servers located in Los Angeles, California.

> d.  *HENLEY Embezzles $10,000 from a Donation*
> *from Donor-4 to Developing Options*

144. On March 21, 2022, Developing Options received $10,000 from Donor-4 intended to support a food program paid for by Developing Options. According to the invoice from Developing

Options, the meal program cost $5,000 for food from a restaurant on November 9, 2021, and November 23, 2021. Developing Options' checks from its bank records show that the actual costs paid for the meal program was $3,000. HENLEY did not personally fund the meal program from the restaurant. Developing Options sent an invoice dated February 2, 2022, to Donor-4 for $5,000 related to the meal program and $5,000 for "Administrative and Office." On March 21, 2022, Developing Options received the $10,000 payment from Donor-4. On March 28, 2022, HENLEY transferred $10,000 to his bank account. The payment from Donor-4 was meant as a charitable donation and was not intended to be given to HENLEY personally.

145. The FBI and IRCS-CI confirmed that Donor-4's check was deposited into the Developing Options account in a Los Angeles branch. The Bank of America branch utilized servers in Richardson, Texas. A week later, HENLEY transferred the money from the Developing Options Bank of America account to his personal Bank of America account, which again utilized servers in Richardson, Texas, to servers located in Los Angeles, California.

> e.    *HENLEY Embezzles $19,000 from a Donation from Donor-5 to Developing Options*

146. On September 21, 2022, Developing Options received a $20,000 check from former NBA MVP ("Donor-5") intended to support Developing Options and the Crenshaw Rams. On September 26 and 30, 2022, and October 7 and 11, 2022, HENLEY transferred various amounts totaling $15,000 to his bank account. The

payment from Donor-5 was intended as a charitable donation and was not intended to be given to HENLEY.

147. The FBI and IRS-CI have confirmed that the Donor-5 check was deposited into the Developing Options account in a Los Angeles branch. The J.P. Morgan Chase branch utilized servers outside of California. The further transfers again utilized J.P. Morgan Chase servers outside California.

f.    *HENLEY Embezzles $36,400 from a Donation from Donor-6 to Developing Options*

148. On November 8, 2022, Developing Options received a $100,000 wire donation from Donor-6, a production company. The purpose of the payment was a donation to support the Crenshaw Rams youth football team by covering the cost of one student athlete[24] in the Crenshaw Youth Football and Cheer Organization. Instead, HENLEY embezzled $36,400 of the donation by transferring the funds into his personal checking account in multiple transfers from November 10, 2022, through December 1, 2022. The donation was taken as a charitable donation on D.T.'s (of Donor-6) personal tax return.

149. The FBI and IRS-CI have confirmed that the Donor-6 wire transfer was routed using Fedwire Service Funds which utilizes servers in New Jersey or Texas to the Developing Options bank account which utilized servers outside of California. For the days after, including on November 15, 2022,

---

[24] I have reviewed multiple letters written by S.H. confirming charitable contributions to the Crenshaw Rams. In each, she states that the donation has covered one student athlete's cost, regardless of the amount, including up to $100,000.

HENLEY moved the funds from Developing Options' J.P. Morgan Chase account to his personal J.P. Morgan Chase account, again utilizing servers outside of California.

> g.    HENLEY Embezzles $32,500 from a Donation
> from Donor-7 to Developing Options

150. On December 13, 2022, Developing Options received $50,000 from a foundation ("Donor-7") as a donation to pay the direct program costs and expenses of operating Developing Options' social justice programs and initiatives.  Instead, between December 19, 2022, and January 3, 2023, HENLEY transferred $32,500 to his bank account in various denominations.  Pursuant to the grant award letter from Donor-7, all grant funds were intended to be used to support Developing Options' social justice programs and initiatives.  Per the 2023 program budget provided to Donor-7, a portion of the grant funds were allocated for employee salaries, which may have included salary paid to HENLEY for his work on behalf of the organization.  However, no grant funds were meant to be given from Donor-7 to HENLEY personally.

151. The FBI and IRS-CI have confirmed that the Donor-7 check was deposited into the Developing Options account in a Los Angeles branch which caused an electric wire from Donor-7's PNC Bank account outside of California and the J.P. Morgan Chase servers outside of California.  For the days after, including on December 19, 2022, HENLEY moved the funds from the Developing Options J.P. Morgan Chase account to his personal J.P. Morgan Chase account, again utilizing servers outside of California.

### 3. Bank Fraud

152. In December 2022, BLANTON was purportedly working for Developing Options and drawing a salary from Developing Options. He was then denied a residential mortgage loan because he could not verify a sufficient amount of income to qualify. I have reviewed the financial records showing the denial.

153. BLANTON then began working with HINES, a licensed loan officer in the Central District of California. On intercepted calls, HINES advised BLANTON that his salary would need to increase for him to qualify for a loan. BLANTON told HINES that he worked for Developing Options and that his "Unc" (i.e., HENLEY) was his employer. HINES then spoke with both HENLEY and MARTIN, as the CEO and CFO of Developing Options, respectively, on further intercepted calls about fraudulently inflating BLANTON's salary temporarily to support his loan application.

154. On January 13, 2023, HENLEY and MARTIN did so by purporting to pay BLANTON $6,500 in "nonemployee compensation," which comes with its own tax form for verification. However, as shown in the calls, BLANTON actually paid HENLEY back the $6,500, so it was not true compensation, just made to look that way to the mortgage lender to artificially inflate BLANTON's claimed income so that he could qualify for the loan. BLANTON never received "nonemployee compensation" any other time.

155. On January 16, 2023, BLANTON electronically submitted his loan application, which I have reviewed. In the application, he reported that he worked for "D O Security," making $8,166.67 per month. As mentioned, on January 4, 2023,

on an intercepted call between HENLEY, BLANTON, and HINES, HINES said that BLANTON needed to show income of $8,166 per month to qualify for the loan, which HENLEY said he could facilitate through HENLEY's security company. In the loan application, BLANTON only listed that income and did not list any income for the "Ex-Offender Fellowshio [sic] Network" employer that he also included in his application. Based on the payroll records from Developing Options and its related entities, I know that BLANTON was making roughly $2,841.06 net pay per month.

156. After law enforcement played recordings of the intercepted calls for HINES, she admitted that she advised HENLEY and MARTIN on how much additional income BLANTON required to get approved for a loan, but she denied advising them to temporarily increase BLANTON's income until the loan application was approved, despite the recording to the contrary.

**I.   HENLEY's Tax Crimes**

157. With IRS-CI, I have obtained tax records related to HENLEY, who had filed Forms 1040 from at least 2017 through 2019. HENLEY was issued Forms W-2 for wages earned from his employment as the CEO of Developing Options, which he reported on his Form 1040 in 2019. HENLEY failed to file Forms 1040 in 2020 and 2021. HENLEY knew he had a duty to file Forms 1040 as he had done so consecutively for three years prior to 2020. Despite knowing he was required to file Forms 1040 as he had done previously, HENLEY willfully failed to file such forms for years 2020 and 2021.

158. HENLEY received compensation from Lightbox Entertainment for his work on the docuseries Hip Hop Uncovered, which was released in 2021, as well as other projects. He also received Forms 1099 reflecting income he had earned in 2019, 2020, and 2021. HENLEY did not report or pay taxes on approximately $80,435.20, which was reflected on the Form 1099 he received from Lightbox Entertainment in 2019. HENLEY also did not file tax returns or pay taxes on the income he earned from the docuseries in 2020 and 2021. In 2020 and 2021, HENLEY received Forms 1099 from Lightbox Entertainment in the amounts of $45,148 and $69,564.57, respectively.

159. HENLEY had been the CEO, President, and Executive Director of Developing Options since approximately 2010. Developing Options is a not-for-profit organization that was heavily funded by the City of Los Angeles' GRYD program. HENLEY signed contracts with the City of Los Angeles to receive GRYD funding each fiscal year. The Developing Options bank account received funds that were not from the City of Los Angeles totaling approximately $153,000 in 2019. Of the approximately $153,000 that was given to Developing Options outside of payments from GRYD, HENLEY embezzled approximately $65,810 from the Developing Options account through bank transfers to his own personal account. These embezzled funds are not included on HENLEY's Form 1040 for 2019. HENLEY also embezzled approximately $14,000 in 2020 and $25,000 in 2021 from Developing Options in the same manner. HENLEY did not file or pay income taxes on these embezzled funds that were transferred

to HENLEY's personal bank accounts and used for his own personal benefit.

**J.    Other Criminal Activity Showing How the Big U Enterprise Operates**

160. In addition to the murder of R.W., robbery, extortion, interstate transportation for prostitution, wire fraud, and bank fraud offenses described herein, the investigation has revealed additional evidence of other activity that demonstrates that the Big U Enterprise constitutes an "enterprise" under 18 U.S.C. § 1961 and that the Big U Enterprise threatens and commits violent acts that allow it to operate. For example, intercepted calls include discussions of the Big U Enterprise, its association with the Rollin' 60s, and issues with the Big U Enterprise members or associates, including Rollin' 60s members, perceived as not behaving properly under the dictates of the Big U Enterprise. Additionally, the calls demonstrate the hierarchy of the Big U Enterprise, with both HENLEY's own words showing his leadership and other Big U Enterprise members discussing HENLEY and his leadership of the Big U Enterprise. The calls also show HENLEY's commitment to demanding respect and exacting violence if it is not received, much like with the murder of R.W. Further, the following criminal activity informs the fraudulent misrepresentations about the Big U Enterprise's entities like Developing Options and Uneek Music's reformation in contracts, such as pandemic-relief loans (which specifically includes an assertion that the applicant is not involved in

illegal activity) and federal funding through GRYD (which demands compliance with the voluminous GRYD handbook).

         1.    <u>HENLEY Coerces a Witness to Recant Statements to Law Enforcement Implicating a Big U Enterprise Associate</u>

161. On December 9, 2022, W.M., a former professional football player in the NFL and one of HENLEY's associates, beat a victim over the head with a bottle at a restaurant in Los Angeles. The assault was captured on video and publicized online.

162. In an intercepted call on December 23, 2022, HENLEY called the assault victim's relative (J.S.) and instructed him to "go to the lineup. Tell him to pick the wrong person." Then, on January 2, 2023, on a multi-way telephone call that was also intercepted, HENLEY said, "The young nigga going to say he stole his watch out the bathroom and [the former NFL player] came to get his watch back and it turned into something else. He's going to apologize for stealing [the former NFL player]'s watch, you know what I'm saying, he thought it was somebody, he thought it was his watch. [The former NFL player] came back to get his watch, and it turned into a scuffle. They were only trying to prevent a crime . . . . Case dismissed."

163. On January 7, 2023, on another intercepted call, HENLEY called J.S. again and told him that the victim needed to take the blame for the incident to avoid criminal charges for the former NFL player. Later that day, the FBI surveilled HENLEY as he and J.S. met with the victim's father.

164. Then, on January 9, 2023, while on an intercepted call with J.S., HENLEY told J.S. to "get the criminal case off" them. HENLEY did not want the fact that the victim was not pressing charges to be attributable to HENLEY and J.S.

165. On another intercepted call on January 9, 2023, HENLEY told his son that HENLEY met the man who was suing the former NFL player.  The next day, J.S. called HENLEY, told him he talked to his lawyer, and said that HENLEY did not have anything to worry about.

        2.   HENLEY Makes Various Threats and Brags about Violence to Further the Big U Enterprise's Reputation for Fear and Violence, Solidifying Its Power to Extort Victims

166. There were a number of calls intercepted during the course of the investigation in which HENLEY bragged about violence that I believe show the Big U Enterprise's continued intention to intimidate and control members of the community through fear and violence.  These include boasts to a victim, but also general recounting of violence, threats, or violent acts that are in line with the Big U Enterprise's modus operandi:

- 11/2022: in multiple calls, HENLEY recounted sending someone to Minnesota to collect several hundred thousand dollars (of which he admits to taking a cut) from a current NBA All-Star; this debt is purportedly collected on behalf of someone who HENLEY refers to as "Jew Boy";

- 11/7/2022: in trying to intimidate a car shop owner into agreeing that HENLEY had paid the full amount he owed (HENLEY had actually paid less than half), HENLEY recounted that he had obviously paid the entire amount because he had just done a robbery and gave all the proceeds to the car shop owner; he then told MARTIN to

get the owner on the phone and that HENLEY would
"kill" the shop owner;

- 11/15/2022: in talking to a former NFL Pro Bowler,
  HENLEY stated that he was going to "beat the shit out"
  of Witness-2 for starting shit between HENLEY and Wack
  100;

- 11/22/2022: speaking to someone in jail, HENLEY said
  he always had two "blowers" on him;[25]

- 11/22/2022: speaking to the same person, HENLEY stated
  he was going to charge someone in federal prison
  $6,000 for a phone;

- 11/23/2022: HENLEY stated he would pay people $50 each
  to beat someone up;

- 11/23/2022: HENLEY recounted paying people to "mess
  up" a store that refused to give him a discount;

- 12/27/2022: HENLEY told someone that they needed to
  "hang OG Crip Cuz" and that he needed to be
  "disciplined thoroughly" for "a violation of
  crippin'";

- 12/30/2022: HENLEY again stated he needed to break
  Wack 100's jaw;

- 12/31/2022: HENLEY recounted being bigger than any
  Rollin' 60s member, including Nipsey Hussle;

- 12/31/2022: HENLEY stated that if he had an issue with
  anyone, they would no longer be alive;

- 1/2/2023: HENLEY coached D.S. on how to portray
  himself to the media, including telling him to wear
  glasses and to claim D.S. worked for Developing
  Options, even though he did not;

- 1/2/2023: HENLEY told D.S. he needed to "at least"
  break Witness-2's jaw;

---

[25] I know from my training, experience, and investigation in
this case that "blowers" is a colloquial term used to describe
firearms.

- 1/3/2023: HENLEY described "tooling up" with a firearm even when he goes to crip neighborhoods;

- 1/3/2023: HENLEY told someone in prison he was buying six phones that could be smuggled in and sold for $1,000 a piece;

- 1/5/2022: HENLEY told someone that another person was a rat and "done";

- 1/12/2023: HENLEY again described needing to "beat the shit out" of Wack 100;

- 1/17/2023: HENLEY described threatening to kill Grape Street Crips;

- 1/17/2023: HENLEY described being the "hunter" of the Rollin' 60s and having "paperwork"[26] on individuals;

- 2/7/2023: HENLEY told ROBINSON he was going to break Victim-1's jaw;

- 2/13/2023: HENLEY stated he was going to break the jaw of a business manager who worked for a former NBA MVP;

- 3/3/2023: HENLEY described the modus operandi of the Big U Enterprise which included robbing individuals but not taking everything from them so that they could continue to work, be robbed, identify other robbery targets, and buy their stolen things back from the Big U Enterprise;

- 4/1/2023: HENLEY asked someone to grab a firearm for him that he left under the tire of a car;

- 4/11/2023: HENLEY discussed with BLANTON an individual who was going to be robbed in the near future;

- 4/17/2023: HENLEY discussed sending a message to a dispensary owner that he "fucked with the wrong guy";

---

[26] I know from my training and experience and investigation into this case that gang members, Big U Enterprise members, and HENLEY himself use the term "paperwork" to describe court documents that indicate that an individual is cooperating with law enforcement.

- 2/14/2023: HENLEY recounted slapping "Jew Boy";

- 2/14/2023: ROBINSON told HENLEY that ROBINSON told "Jew Boy" that he owed them money, that they would allow a payment plan, but if he did not pay, they were going to "shut this motherfucker down";

- 4/1/2023: HENLEY asked someone to grab HENLEY's "blower," which he left on the ground, in a blue sweatshirt, in front of a tire.

3.  HENLEY and ROBINSON Describe Other Threats and Violent Acts of the Big U Enterprise

167. Throughout the Big U Enterprise's extortion of Victim-1, members of the Big U Enterprise discussed violence and illegal activities to Victim-1 in order to intimidate Victim-1 and ensure that Victim-1 kept paying extortion fees to the Big U Enterprise.  Examples include:

- 6/22/2022: ROBINSON told Victim-1 that it was necessary to have a firearm when hanging out with HENLEY;

- 7/9/2022: HENLEY recounted to Victim-1 an incident in which HENLEY and Rollin' 60s gang members chased down Wack 100 attempting to hurt him -- "there's 15 to 20 niggas with us, with hoodies tied down.  I got my hoodie on all black, tied down.  She like, boom, she jumped in the car, paid for [U/I] and then took off. Boom, this nigga screamin', 'My wife, Draws, I see you, Eugene, I see you, Eugene Henley, I see you!'  He screamin' all that, 'He's got his blower, [U/I] his blower out [U/I],' but he's fucked up because nobody's around.  We like, 'Bitch ass nigga.'  I'm like, 'Yeah, bitch ass nigga.'  He like, '[U/I] die here, man. Don't do this.  My wife, my kids in that car.  Draws, Draws, Draws, don't do this,' he screamin'."

- 10/22/2022: ROBINSON told Victim-1 that HENLEY could not be patted down at a club because he would be armed.

VIII.    **Identification of the Property and Premises to Be Searched and Probable Cause That Evidence of the Various Subject Offenses Will Be Found in That Property and at Those Premises**

168. Open-source records that I reviewed on March 13, 2025, list HENLEY'S 62ND STREET RESIDENCE, HENLEY'S ARLINGTON PREMISES, and ROBINSON'S PREMISES for HENLEY and ROBINSON, respectively, as well as HENLEY'S MERCEDES as registered to HENLEY. Further, according to records obtained during the course of the investigation, DEVELOPING OPTIONS' PREMISES is the organization's registered address.

169. Throughout the course of the investigation, FBI SAs and Task Force Officers, including myself, have witnessed HENLEY driving HENLEY'S MERCEDES. The FBI has also obtained financial documents showing that HENLEY purchased HENLEY'S MERCEDES, and the vehicle is registered in HENLEY's name. As discussed above, FBI SAs and Victim-1 also observed ROBINSON driving HENLEY'S MERCEDES during a period in which HENLEY was conspicuously attempting to evade law enforcement after detectives had spoken with HENLEY's wife at HENLEY'S 62ND STREET PREMISES. In June 2023, the FBI and other law enforcement officers conducted a traffic stop and served a DNA warrant on HENLEY who was driving HENLEY'S MERCEDES at the time.

170. Throughout the course of the investigation, FBI SAs and Task Force Officers, including myself, have seen HENLEY coming and going from HENLEY'S 62ND STREET PREMISES on a consistent basis, indicative of him residing there. The aforementioned traffic stop of HENLEY while he was driving

HENLEY'S MERCEDES occurred outside of HENLEY'S 62ND STREET
PREMISES as HENLEY was returning home.  The Title III wire
interceptions of HENLEY's telephones included GPS data that
showed HENLEY residing at HENLEY'S 62ND STREET PREMISES during
the months-long interception period.  In December 2024, HENLEY
appeared on the local news claiming that $40,000 worth of toys
was stolen from outside of HENLEY'S 62ND STREET RESIDENCE.  On
January 28, 2025, FBI SAs served a subpoena at HENLEY'S 62ND
STREET PREMISES, and HENLEY's wife accepted service there.
Additionally, based on cell-site location information that the
FBI and LAPD began receiving on March 14, 2025, pursuant to a
state search warrant, I know that HENLEY's phones both were at
HENLEY'S 62ND STREET RESIDENCE overnight, indicating that he
slept there.  FBI SA Dezmond Beverly further observed HENLEY'S
MERCEDES at HENLEY'S 62ND STREET RESIDENCE on March 14, 2025.
Finally, over the last night -- from March 16, 2025 to March 17,
2025 -- cell-site location information placed HENLEY's phones at
HENLEY'S 62ND STREET RESIDENCE throughout the night.

171. Throughout the course of the investigation and during
the Title III wiretap intercepts, HENLEY discussed his ownership
of HENLEY'S ARLINGTON PREMISES, including making various trips
to HENLEY'S ARLINGTON PREMISES.  These discussions included
sending others to HENLEY'S ARLINGTON PREMISES to pick up things
for him, including his "toy."[27]  HENLEY also set up an extortion
payment to be paid by Victim-1 at HENLEY'S ARLINGTON PREMISES,

---

[27] In my training and experience and investigation into this
case, I know "toy" to be a slang term referencing a firearm.

which was completed on camera. Victim-1 was also called to HENLEY'S ARLINGTON PREMISES to collect items that the Big U Enterprise robbed from the marijuana dispensary discussed above. At times, HENLEY has previously rented HENLEY'S ARLINGTON PREMISES to tenants and directed others collect rent from tenants at HENLEY'S ARLINGTON PREMISES. I ran an LA Clear public information search on March 13, 2025, and no other individuals are listed as currently residing at HENLEY'S ARLINGTON PREMISES. Based on my training and experience and my knowledge of this investigation, I believe that HENLEY and the Big U Enterprise use HENLEY'S ARLINGTON PREMISES as a location, separate and apart from HENLEY's primary residence (i.e., HENLEY'S 62ND STREET PREMISES), in which to conduct illegal activity to avoid detection by law enforcement.

172. Throughout the investigation and during the Title III wiretap interceptions, ROBINSON slept at ROBINSON'S PREMISES nearly every night and otherwise came and went from ROBINSON'S PREMISES, indicating that the location is his domicile. FBI SAs and Task Force Officers have conducted extensive surveillance during the course of the investigation and have witnessed ROBINSON at ROBINSON'S PREMISES, ROBINSON's car parked at ROBINSON'S PREMISES, and have heard on recordings ROBINSON discussing his desire to stay at ROBINSON'S PREMISES (in the San Fernando Valley) to stay out of Los Angeles. ROBINSON's cell-site location information that the FBI and LAPD obtained pursuant to a state search warrant on March 14, 2025, showed that his phone was at ROBINSON'S PREMISES overnight that night.

On March 15, 2025, at approximately 10 p.m., FBI SA Matthew
Hutchison observed ROBINSON return to ROBINSON'S PREMISES.
Cell-site location data placed ROBINSON's phone at ROBINSON'S
PREMISES after he returned.  Finally, over the last night --
from March 16, 2025 to March 17, 2025 -- cell-site location
information placed ROBINSON's phone at ROBINSON'S PREMISES
throughout the night.

173. Throughout the investigation, FBI SAs and Task Force
Officers observed MARTIN at MARTIN'S PREMISES, consistent with
it being MARTIN's primary domicile, despite that open-source
records and financial records listed another address for MARTIN.
Title III wiretap interceptions also showed GPS data consistent
with MARTIN living at the location and spending most of his
nights there.  Additionally, open-source records list MARTIN's
son as residing as MARTIN'S PREMISES.  On March 14, 2025, the
FBI and LAPD began receiving cell-site location information on
one of MARTIN's phone numbers, pursuant to a state search
warrant.  That evening, MARTIN's cell-site location information
placed his number at MARTIN'S PREMISES consistent with him
sleeping there.  On March 15, 2025, I personally conducted
surveillance on MARTIN'S PREMISES and observed MARTIN exit the
complex containing MARTIN'S PREMISES.  Finally, over the last
night -- from March 16, 2025 to March 17, 2025 -- cell-site
location information placed MARTIN's phone at MARTIN'S PREMISES
throughout the night.

174. Accordingly, although the FBI has identified other
addresses appearing to be associated with ROBINSON and MARTIN, I

believe based on the investigation to date that ROBINSON'S PREMISES and MARTIN'S PREMISES are the primary residences for ROBINSON and MARTIN, respectively, and that evidence of ROBINSON's and MARTIN's Subject Offenses will be found at ROBINSON'S PREMISES and MARTIN'S PREMISES.

175. During the course of this investigation, bank and other records for Developing Options have listed an address different from DEVELOPING OPTIONS' PREMISES. However, there is more recent probable cause that DEVELOPING OPTIONS' PREMISES is Developing Options' current address. On March 12, 2025, the FBI observed that "Developing Options" is listed in the building directory of the building that houses DEVELOPING OPTIONS' PREMISES. FBI SA Neomi Carter informed me that when she served a subpoena on another entity located in another suite in the same building, she observed signage for Developing Options and its d/b/a Crenshaw Rams at DEVELOPING OPTIONS' PREMISES. Additionally, DEVELOPING OPTIONS' PREMISES is elsewhere listed as the registered address for Developing Options, including on Google and job finding websites such as salary.com and the GuideStar organization. The Developing Options website lists the contact and address for the organization simply as "Crenshaw."

### IX. SUMMARY OF PROBABLE CAUSE THAT DEVELOPING OPTIONS IS PERMEATED BY FRAUD AND THAT RELEVANT EVIDENCE WILL BE FOUND AT DEVELOPING OPTIONS' PREMISES

176. Based on the totality of evidence obtained during the course of this investigation, I believe there is probable cause that Developing Options is an entity permeated by fraud and

evidence of its use as an instrumentality for financial and other crimes committed by the Big U Enterprise and its members and associates will be found at DEVELOPING OPTIONS' PREMISES.

a.    As discussed above, the HENLEY and the Big U Enterprise solicit funding and donations to Developing Options under the guise of purported charity work Developing Options conducts as a nonprofit entity.  As discussed herein, however, the Big U Enterprise uses Developing Options for its fraudulent means, including embezzling donations into HENLEY's personal bank account and fabricating BLANTON's salary to apply for a mortgage.

b.    In addition to HENLEY embezzling money out of Developing Options' bank account into his personal bank account, as described above, I believe that HENLEY also instructed his wife to use Developing Options' credit card for HENLEY and his family's own personal use and benefit.  On March 27, 2023, on intercepted calls between HENLEY, his wife, and an individual with the initials A.M., HENLEY instructed his wife to use Developing Options' credit card to purchase air conditioning units for HENLEY'S ARLINGTON PREMISES.  HENLEY said that he was going to order the units and cancel the order afterward.  HENLEY asked his wife if the card had $8,000 to $9,000 to use, which she said it did.  On March 28, 2023, on another intercepted call, HENLEY's wife said that she just got back from Lowe's, and HENLEY told her that they were going to cancel the units after they arrived, telling her to have the contractor go to Lowe's and pick them up.

177. Based on my training and experience and knowledge of this investigation, I believe the above factors collectively indicate that HENLEY and the Big U Enterprise utilize Developing Options as an instrumentality of racketeering and financial crimes, and in furtherance the objects of the Big U Enterprise.

178. Accordingly, I believe that there is probable cause to believe that evidence of Developing Options' Subject Offenses will be found at DEVELOPING OPTIONS' PREMISES.

## X. TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES

179. Based on my training and experience, as well as my familiarity with investigations conducted by other law enforcement officers into racketeering enterprises, including those engaged in violence, extortion, murder (and similar acts of violence), money laundering, illegal gambling, fraud, financial crimes, and other racketeering activity conducted by criminal enterprises ("Racketeering Activity"), I know the following:

a. Racketeering Activity involves numerous co-conspirators, often organized into a hierarchical structure and operating in a defined territory. Criminal enterprises may operate illegal casinos, sell narcotics, extort others involved in legitimate and illegitimate businesses, launder the proceeds of their illicit activities, commit acts of violence, and engage in other criminal conduct. Criminal enterprise members will often take and share photographs and videos of their illicit activities using their digital devices.

b.    Criminal enterprise members often maintain books, receipts, notes, ledgers, bank records, and other records relating to their Racketeering Activity.  Such records are often maintained where the criminal enterprise member has ready access to them, such as in their homes, their places of business, in their vehicles, on their persons, and in their cellphones and other digital devices.  Additionally, I know that individuals engaged in racketeering enterprises often keep such evidence for long periods of time, including in storage on their digital devices that they keep in close proximity, for extended periods of time, including in their homes, their places of business, and on their persons.

c.    Communications between co-conspirators, as well as from victims of Racketeering Activity, often take place by telephone calls and messages, such as e-mail, text messages, the exchange of photographs and videos, and social media messaging applications, sent to and from cellphones and other digital devices.

d.    Criminal enterprise members often keep the names, addresses, and telephone numbers of those involved in their Racketeering Activity on their digital devices.  Criminal enterprise members often keep records of meetings with associates on their digital devices, including in the form of notes, calendar entries, and location data.

e.    Criminal enterprise members often possess firearms to protect and advance their Racketeering Activity.  Criminal enterprise members often keep information regarding

their firearms on their digital devices, including contacts that can provide firearms and photographs of firearms they possess and use.

## XI.   **TRAINING AND EXPERIENCE ON ROBBERY AND EXTORTION OFFENSES**

180. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct robbery and extortion investigations, I am aware of the following:

a.    Persons who engage, participate, or are otherwise involved in robberies or extortions generally maintain records of their stolen or extorted items and money and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their places of business or their vehicles or digital devices, including cloud storage accounts within those devices. Particularly in robbery or extortion conspiracies involving multiple robberies, extortions, or co-conspirators, those records are often maintained for long periods of time.

b.    People who participate in robberies or extortions will keep the contact information of co-conspirators or other individuals involved in criminal activities for future use. Such information is also kept on digital devices and in cloud storage.

c.    Individuals involved in robberies or extortions frequently use their cellphones to coordinate with co-conspirators and to research robbery or extortion victims. Cellphones, for example, may be used to set meeting locations,

pick routes to the robberies or extortions, coordinate times, and recruit crew members.

d.    Many people also keep mementos from their robberies or extortions, including digital photographs or recordings of themselves possessing items or cash from the robbery or extortion victim.  These photographs and recordings are often shared via social media, text messages, and other applications.

e.    Those who commit robberies or extortions often sell the stolen items or keep them in their possession.  Those who steal or extort cash may launder that money shortly after or make large purchases after the robbery or extortion. Correspondence between persons buying and selling stolen items, laundering money, or making large purchases, often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  That includes sending photographs of the stolen items between the seller and the buyer, as well as negotiation of prices.  In addition, it is common for individuals who engage in robberies or extortions to have photographs of the stolen items, large amounts of cash, or new purchases that they or other individuals working with them possess on their cellphones and other digital devices as they frequently send these photographs to each other to boast of their proceeds, to facilitate sales or transfers of the stolen items or cash, or otherwise discuss the proceeds of the robberies or extortions.

f.    Individuals engaged in robberies or extortions often use multiple digital devices, including digital devices belonging to friends or associates, to minimize the chance of being traced.  Additionally, multiple digital devices are often used for communicating with lookout vehicles and other co-conspirators committing robberies and extortion.

g.    Furthermore, even if a person deleted any digital evidence of robberies and extortion or any other criminal activities, there is still probable cause to believe that there will be evidence of robberies and extortion in the digital devices and in cloud storage.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such digital evidence can be recovered months or years after they have been deleted from a digital device.  For example, even if text messages between co-conspirators surrounding the robbery or extortion are deleted, evidence that they were communicating at the relevant times and in the relevant locations may be recovered using forensic tools.

## XII. <u>TRAINING AND EXPERIENCE ON HOMICIDE OFFENSES</u>

181. Based on my training and experience, and the training and experience of other agents with greater involvement in murder investigations, I know the following:

a.    Individuals who commit homicides or seek the assistance of others in committing homicides or concealing the evidence of homicides often maintain materials about their intended victims in their residences or places of business, in their vehicles, on their persons, and on their digital devices,

and often for long periods of time.  This information could include information about or photographs of their intended victims, their home addresses, information about places they frequent, or the motive behind such intended homicide.  It could also include information about the victims' family members, communication with or from the victims' friends or family, or other information that could be used to carry out or conceal the murder.

b.    It is also common for individuals who have committed a homicide, or attempted to do so, to search social media or the internet using their digital devices to determine what investigators, news sources, or social media users know and/or are disseminating about the facts of the murder. Individuals who commit homicides will often do so in an attempt to determine what potential evidence may be used against them, to determine whether or not they are suspected of committing the murder, and if and how the suspect can formulate a plausible alibi or explanation for the involvement with the victim.

XIII.      **TRAINING AND EXPERIENCE ON HUMAN TRAFFICKING OFFENSES**

182. From my training, personal experience, and the collective experiences shared with me by other law enforcement officers who conduct human trafficking investigations, I am aware of the following:

a.    Individuals involved in human trafficking frequently use their cellphones to coordinate with co-conspirators, customers, and victims.  For example, cellphones are used to set meeting locations, coordinate meeting times,

arrange travel, negotiate payments, and recruit co-conspirators, customers, and victims.

b.    Individuals involved in human trafficking generally maintain records over time of their communications with co-conspirators, customers, and victims, as well as payments, in their digital devices, including their cloud storage accounts through previous backups even if the communications are not preserved on the physical device. People who participate in human trafficking will keep the contact information of co-conspirators, customers, and victims for future use regardless of the passage of time from the last communication. Such information is kept on digital devices and in cloud storage.

c.    Many human traffickers also keep visual depictions of their victims, including digital photographs or recordings of their victims to share with customers and potential customers. These photographs and recordings are often shared via social media, text messages, and over other messaging applications.

## XIV.  **TRAINING AND EXPERIENCE ON FINANCIAL CRIMES**

183. Through the course of this investigation, my communications with financial analysts and IRS-CI SAs, and my training and experience as an FBI SA generally, I know the following:

a.    Business owners, including the owners of purported not-for-profit 501(c)(3) entities, typically maintain business records at their business locations, as well as in

their residences and in their digital devices.  It is common practice for businesses to maintain records of income, expenses, losses, asset acquisition and disposition, receipts, employment records, compliance with contract records, and other business-related documents in digital and hardcopy forms.  These records would include employee records, journals, ledgers, bank statements, canceled checks, deposit slips, income and information tax returns, grant receipts and expenditures, not-for-profit certification records, records relating to compliance with any grant programs, and other records showing the receipt and disposition of funds.

b.    Nonprofit entities and other businesses that have employees typically maintain detailed records of their payroll for proper reporting purposes, including end-of-the-year Forms W-2 that are issued to employees, as well as expenses, particularly if they participate in grant contracts based solely on reimbursement.  These records can be voluminous and are often stored in the office.

c.    Records of employee payroll maintained by staffing agencies frequently include paystubs, bank statements, canceled checks, deposit slips, and other records showing the receipt and disposition of funds.  Original business records, as well as tax records, are frequently kept and maintained for extended periods of time, often several years.

d.    Nonprofit entities also maintain records of expenditures that can be submitted for reimbursement in alignment with any grant programs, such as the GRYD foundation,

and similarly maintain detailed records of their expenditures. These records can be voluminous and are often stored in the office.

### XV.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[28]

184. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[28] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

185. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

186. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrants I am applying for regarding HENLEY, HENLEY'S MERCEDES, HENLEY'S 62ND STREET PREMISES, HENLEY'S ARLINGTON PREMISES, ROBINSON, ROBINSON'S PREMISES, MARTIN, and MARTIN'S PREMISES would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HENLEY, ROBINSON, or MARTIN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of HENLEY, ROBINSON, or MARTIN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    Additionally, in my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience,

that person may not be the only user of the device whose

physical characteristics are among those that will unlock the

device via biometric features, and it is also possible that the

person in whose possession the device is found is not actually a

user of that device at all.  Furthermore, in my training and

experience, I know that in some cases it may not be possible to

know with certainty who is the user of a given device, such as

if the device is found in a common area of a premises without

any identifying information on the exterior of the device.

Thus, if while executing the warrant to search DEVELOPING

OPTIONS' PREMISES, law enforcement personnel encounter a digital

device within the scope of the warrant that may be unlocked

using one of the aforementioned biometric features, the warrant

I am applying for would permit law enforcement personnel to,

with respect to every person who is located at DEVELOPING

OPTIONS' PREMISES during the execution of the search who is

reasonably believed by law enforcement to be a user of a

biometric sensor-enabled device that falls within the scope of

the warrant: (1) depress the person's thumb- and/or fingers on

the device(s); and (2) hold the device(s) in front of the face

of the person with his or her eyes open to activate the facial-,

iris-, and/or retina-recognition feature.

187. In addition to what has been described herein, the

United States has attempted to obtain some of this data by

warrant to search AFLLEJE's Apple accounts, the results of which

are still pending, and by subpoena to Developing Options.  On

March 4, 2025, in response to that subpoena, a representative of

Developing Options provided bank statements from various companies, including Developing Options, and what appear to be newly created spreadsheets showing accounting for Developing Options and Celebrity Socks for various years dating back to 2017. The documents related only to financial information and did not include any documentation of work done by Developing Options as part of the GRYD foundation (or any other charitable work), payroll, IRS, or any of the other documents sought by the subpoena. The United States also interviewed and served a subpoena to a financial advisor/bookkeeper (the "bookkeeper") and return preparer who created financial statements and tax returns for HENLEY and his entities after HENLEY was aware he was the subject of a criminal investigation. The bookkeeper explained that prior to his work beginning around February 2024, HENLEY and his entities had no financial statements. The bookkeeper explained that they only had bank statements and that HENLEY told the bookkeeper that HENLEY was under investigation. The records provided in response to the subpoenas to Developing Options and the bookkeeper included a version of financial statements created in February 2025. Prior to meeting with the bookkeeper, IRS-CI interviewed and served a subpoena for records to a return preparer, who was hired around March 2024 to amend and create HENLEY's and his entities' tax returns. The amended and newly created tax returns were created using an earlier version of financial statements provided by the bookkeeper. After HENLEY was aware he was under criminal investigation, and again, after subpoenas were served and interviews were conducted

of the return preparer and bookkeeper, there were changes to the
classifications of transactions for HENLEY and his entities.
For this reason, I believe, as do IRS-CI agents with knowledge
of the investigation, that the books and records provided by
Developing Options in subpoena responses cannot be relied upon.

## XVI. CONCLUSION

188. For all the reasons described above, there is probable
cause to believe the following:

      a.   HENLEY, ROBINSON, and MARTIN violated 18 U.S.C.
§ 1962(d) (Racketeer Influenced and Corrupt Organizations
Conspiracy);

      b.   WILLIAMS violated 18 U.S.C. § 1951(a)
(Interference with Commerce by Robbery);

      c.   AFLLEJE violated 18 U.S.C. § 2421(a)
(Transportation of an Individual in Interstate Commerce with
Intent that the Individual Engage in Prostitution); and

      d.   BLANTON and HINES violated 18 U.S.C. § 1344(1)
(Bank Fraud).

189. Further, there is probable cause to believe that the
items listed in:

      a.   Attachment B-1, which constitute evidence,
fruits, and instrumentalities of violations of HENLEY's Subject
Offenses will be found at, in, or on HENLEY, HENLEY'S MERCEDES,
HENLEY'S 62ND STREET PREMISES, and HENLEY'S ARLINGTON PREMISES,
as described in Attachments A-1, A-2, A-3, and A-4;

      b.   Attachment B-2, which constitute evidence,
fruits, and instrumentalities of violations of ROBINSON's and

MARTIN's Subject Offenses will be found at or on ROBINSON, ROBINSON'S PREMISES, MARTIN, and MARTIN'S PREMISES, as described in Attachments A-5, A-6, A-7, and A-8; and

         c.    Attachment B-3, which constitute evidence, fruits, and instrumentalities of violations of the Developing Options' Subject Offenses will be found at DEVELOPING OPTIONS' PREMISES, as described in Attachment A-9.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  17th day of  March , 2025.

_____
UNITED STATES MAGISTRATE JUDGE